Filed 2/16/17 (unmodified opn. attached)

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ABRAHAM SANCHEZ, JR., | F069843 |
| Plaintiff and Appellant, | (Super. Ct. No. S1500-CV-270098) |
| v. | <u>**ORDER**</u> |
| KERN EMERGENCY MEDICAL TRANSPORTATION CORPORATION, | <u>**MODIFYING OPINION**</u> **[No Change in Judgment]** |
| Defendant and Respondent. | |

Having read and considered Respondent's "Request for Correction and Modification" filed on February 8, 2017, IT IS HEREBY ORDERED that the partially published opinion filed herein on February 2, 2017, be modified as follows:

1. On page 12, at the end of the first full paragraph, the word "median" is changed to "mean" so the sentence reads:

   "Defendant computed an approximate …, by deducting from the eight minutes between 21:30 and 21:38 the approximate mean time to complete the spinal precautions (five & one-half minutes)."

2. On page 14, second and third sentences in the last paragraph, the misspelled name "Schrager" is changed to correctly read "Schriger" the three times it appears in the two sentences.

3. On page 17, second sentence of the last paragraph that begins with "This was not a case," the words "to support" are changed to "that supported" so the sentence reads:

> "This was not a case in which the experts relied on different medical studies or different interpretations of the medical literature that supported their opinions; in such a case, the court …."

Except for the modifications set forth, the opinion previously filed remains unchanged.

This modification does not effect a change in the judgment.

HILL, P. J.

WE CONCUR:

POOCHIGIAN, J.

DETJEN, J.

Filed 1/13/17; part. pub. order 2/2/17 (see end of opn.) (unmodified version)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ABRAHAM SANCHEZ, JR.,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>KERN EMERGENCY MEDICAL TRANSPORTATION CORPORATION,<br><br>Defendant and Respondent. | F069843<br><br>(Super. Ct. No. S-1500-CV-270098)<br><br>**<u>OPINION</u>** |

APPEAL from a judgment of the Superior Court of Kern County. Sidney P. Chapin, Judge.

Rodriguez & Associates, Daniel Rodriguez, Joel T. Andreesen, Chantal Trujillo; Esner, Chang & Boyer, Stuart B. Esner and Andrew N. Chang for Plaintiff and Appellant.

Sclar Adler, Matthew Banashek and Michael W. Irving for Defendant and Respondent.

-ooOoo-

Plaintiff appeals from a summary judgment entered against him in his action arising out of injuries he sustained during a high school football game. Defendant provided ambulance services at the game; the crew of the standby ambulance assessed plaintiff's condition and summoned a transport ambulance to take plaintiff to the hospital.

A short time later, plaintiff's condition deteriorated and the transport ambulance upgraded the call to a lights and siren emergency. At the hospital, plaintiff was diagnosed with and treated for a subdural hematoma. Plaintiff alleged the standby ambulance crew was grossly negligent in not properly assessing plaintiff's condition and immediately transporting him to the hospital in the standby ambulance. Defendant's motion for summary judgment was based on evidence its personnel were not grossly negligent in their assessment or care of plaintiff, and there was no evidence the brief delay caused by transferring plaintiff from one ambulance to the other caused any increase in the severity of his injuries. The motion was supported by extensive expert declarations. The trial court sustained objections to some of the opinions in the expert declaration submitted by plaintiff in opposition. It found there was no triable issue of material fact regarding causation and granted defendant's motion. We find no error and therefore affirm.

### *FACTUAL AND PROCEDURAL BACKGROUND*

On October 2, 2009, plaintiff sustained an injury to his head while playing in a high school football game. The coaches, noticing he was unsteady when he walked, examined him. Plaintiff complained of head pain and winced when a coach shined a flashlight in his eyes. The coaches waved over the standby ambulance and its crew, paramedic Aaron Moses and emergency medical technician (EMT) Ben Armstrong. The ambulance and crew arrived within two minutes.

Moses first contacted plaintiff at approximately 21:25.[1] Plaintiff was sitting upright on a table at the sideline of the field; he responded to Moses's questions. Moses testified he assessed plaintiff using the Glasgow Coma Scale, a clinical tool designed to assess coma and impaired consciousness. The patient is given a score for each of three

---

[1] Consistent with the motion for summary judgment and the medical records, we express times in terms of a 24-hour clock.

2.

categories of responses: eye opening response, verbal response, and motor response. Moses stated he assessed plaintiff with the highest total score possible, 15 out of 15, because of his responses to Moses. Plaintiff asserted Moses either did not assess plaintiff's condition correctly or did not assess his condition at all, based on the symptoms plaintiff exhibited. Nonetheless, Moses told plaintiff he should go to the hospital and plaintiff agreed.

At 21:30, Moses radioed dispatch for a backup ambulance to transport plaintiff to the hospital Code 2 (immediate response without lights and siren).[2] The standby crew applied spinal precautions, which were appropriate under the circumstances. They then loaded plaintiff into the ambulance and drove to the northeast corner of the field to meet the transport ambulance. The transport ambulance arrived at the football field at 21:34. The transport ambulance crew, paramedic Benjamin Ferguson, EMT William Hendricks, and EMT/paramedic trainee Ryan Rice, made first contact with plaintiff at 21:38. By 21:42, the transport ambulance was leaving the football field on its way to the hospital. Between 21:43 and 21:48, the transport ambulance crew upgraded the call to a Code 3, a lights and siren emergency. They transported plaintiff to Kern Medical Center (KMC), a distance of approximately 31 miles, in 30 minutes. The emergency room personnel took custody of plaintiff at 22:13.

After a computerized tomography (CT) scan, plaintiff was diagnosed with a right-sided subdural hematoma. At 23:00, he was administered mannitol to reduce brain swelling. At 23:42, he was taken to the operating room where, at 00:35 on October 3,

---

**2**    Defendant's paramedic expert declared that the prevailing practice by ambulance companies that did standby work at high school football games in Kern County was: if a patient at the game needed urgent, but not emergency, hospital care, a backup ambulance would be called and used to transport the patient while the standby ambulance remained at the football field; if the patient required emergency care, the standby ambulance would transport the patient to the hospital. Other testimony indicated the game would be suspended if there was no ambulance present. Plaintiff denied such a prevailing practice existed.

2009, he underwent craniotomy surgery to relieve his brain hemorrhage. At some point, plaintiff suffered a posterior artery stroke.

In this action, plaintiff sued Kern Emergency Medical Transportation Corporation doing business as Kern Ambulance Service (defendant) and others for his injuries. He alleged defendant was grossly negligent (the standard of care applicable to paramedics and EMTs pursuant to Health & Saf. Code, § 1799.106) in the care and treatment it rendered to him; defendant failed to properly assess him and failed to recognize he had sustained a traumatic brain injury that required immediate, urgent transport to a trauma center. Defendant allegedly wasted time and did not immediately, urgently or rapidly transport plaintiff to a trauma center, as a proximate cause of which his brain injury was made worse. Plaintiff conceded the crew of the transport ambulance did not act in bad faith or with gross negligence in treating him; he also conceded the hospital personnel were not negligent in their care of plaintiff.

Defendant moved for summary judgment, asserting there was no evidence to support plaintiff's allegations of gross negligence or causation of any damages. It argued Moses properly evaluated plaintiff's condition and could not have immediately transported plaintiff to the hospital in the standby ambulance Code 3 because plaintiff did not meet Kern County's criteria for activating the trauma system (i.e., transporting plaintiff Code 3) until he was placed in the transport ambulance and his condition deteriorated. Using a timeline, defendant also argued that the delay caused by using two ambulances was only two and-one-half minutes, which did not harm plaintiff or increase his injuries. Additionally, it argued that, even if the delay was as much as 30 minutes, plaintiff could not demonstrate the delay caused him any injury, or increased the injury he suffered, because the medical literature indicates there is no evidence such a brief delay in treatment correlates with a worse outcome for the patient.

Plaintiff opposed the motion, arguing Moses failed to assess plaintiff's condition, or failed to properly assess it, and his resultant failure to rapidly transport plaintiff to the

4.

hospital was a substantial factor in causing his brain injury to be more extensive or severe. In support, he submitted expert declarations, including the declaration of Dr. Fardad Mobin, a neurological surgeon. Without addressing any of the medical literature presented by defendant, Mobin opined, among other things, that had plaintiff "been transported immediately upon Moses' initial contact at 9:25 p.m., there would have been a decrease in brain swelling, and thereby pressure, because the administration of Mannitol would have occurred much sooner." Defendant objected to portions of Mobin's declaration.

The trial court granted defendant's motion for summary judgment, after sustaining some of defendant's objections to Mobin's declaration and overruling others. It concluded plaintiff "failed to proffer substantial, admissible evidence from which a trier of fact could find in his favor on a necessary element of causation of injury." Plaintiff appeals from the judgment subsequently entered.

## DISCUSSION

### I. Standards

#### A. *Review of motion for summary judgment*

We review an order granting summary judgment de novo. (*Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 860 (*Aguilar*).) Summary judgment is properly granted when no triable issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A defendant moving for summary judgment has met his or her burden of showing a cause of action has no merit if the defendant has shown that one or more elements of the plaintiff's cause of action cannot be established. (Code Civ. Proc., § 437c, subd. (p)(2).) "[T]he defendant bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact. [Citation.] If the defendant carries the burden of production, the burden shifts to the plaintiff to make his or her own prima facie showing of the existence of a triable issue of fact." (*McGonnell v. Kaiser Gypsum*

5.

*Co.* (2002) 98 Cal.App.4th 1098, 1103 (*McGonnell*).) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar*, at p. 850, fn. omitted.) The evidence in favor of the party opposing the motion must be liberally construed, and all doubts concerning the evidence must be resolved in favor of that party. (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460.)

On appeal, we "'must assume the role of the trial court and redetermine the merits of the motion' using the same standards required below." (*Hernandez v. KWPH Enterprises* (2004) 116 Cal.App.4th 170, 175.)

### B.     *Claims against emergency medical personnel*

Providers of emergency medical services, including paramedics and EMTs, "shall only be liable in civil damages for acts or omissions performed in a grossly negligent manner or acts or omissions not performed in good faith." (Health & Saf. Code, § 1799.106, subd. (a).) Gross negligence is defined as the lack of even scant care or an extreme departure from the ordinary standard of conduct. (*City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 754.)

"Whenever the plaintiff claims negligence in the medical context, the plaintiff must present evidence from an expert that the defendant breached his or her duty to the plaintiff and that the breach caused the injury to the plaintiff." (*Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 123 (*Powell*).) "''"When a defendant moves for summary judgment and supports his motion with expert declarations that his conduct fell within the community standard of care, he is entitled to summary judgment unless the plaintiff comes forward with conflicting expert evidence."''" (*Ibid.*)

## II.     Request for Judicial Notice

"The reviewing court may take judicial notice of any matter specified in [Evidence Code] Section 452." (Evid. Code, § 459, subd. (a).) Defendant requested judicial notice

6.

of several items that were not before the trial court.  It cited Evidence Code section 452, subdivision (h), as the basis of its request.  That subdivision grants the court discretion to take judicial notice of "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy."  (Evid. Code, § 452, subd. (h).)  It is intended to encompass facts that are widely accepted and easily verified.

The items identified by defendant in its motion as "Scientific Literature" and "Attorney Correspondence" do not constitute "[f]acts and propositions that are not reasonably subject to dispute," (Evid. Code, § 452, subd. (h)) nor has defendant established their "reasonably indisputable accuracy."  (*Ibid*.)  Further, they are not necessary to the resolution of this appeal.  (*Health First v. March Joint Powers Authority* (2009) 174 Cal.App.4th 1135, 1137, fn. 1.)  The "Notice of CCP 998 Cost Award and Revised Judgment" appears to be a court record subject to judicial notice under Evidence Code section 452, subdivision (d), but it is not relevant or necessary to the resolution of this appeal.  (*People v. Rowland* (1992) 4 Cal.4th 238, 268, fn. 6 [judicial notice limited to relevant matters].)  Accordingly, the request for judicial notice is denied.

## III.  Evidentiary Objections

In the trial court, each party submitted expert declarations addressing the issues of breach of duty and causation.  Defendant objected to portions of the expert declaration of Mobin, submitted by plaintiff.  The trial court sustained some of the objections.  Plaintiff contends the declaration established the prerequisites to admission of the evidence it contained, and none of the objections should have been sustained.

### A.  *Standard of review*

We review the trial court's ruling on the admissibility of expert testimony for abuse of discretion.  (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 (*Sargon*).)  A court abuses its discretion if its ruling is "'so irrational or arbitrary that no reasonable person could agree with it.'"  (*Ibid*.)  "When applying the

deferential abuse of discretion standard, 'the trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.'" (*In re C.B.* (2010) 190 Cal.App.4th 102, 123.) "It is the appellant's burden on appeal to show the trial court abused its discretion." (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 957.)

### B.    *Expert declarations*

"If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is:

"(a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and

"(b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion." (Evid. Code, § 801.)

Thus, "[a] properly qualified expert may offer an opinion relating to a subject that is beyond common experience, if that expert's opinion will assist the trier of fact." (*Bushling v. Fremont Medical Center* (2004) 117 Cal.App.4th 493, 510 (*Bushling*).) "However, even when the witness qualifies as an expert, he or she does not possess a carte blanche to express any opinion within the area of expertise. [Citation.] For example, an expert's opinion based on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors [citation], has no evidentiary value [citation] and may be excluded from evidence. [Citations.] Similarly, when an expert's opinion is purely conclusory because unaccompanied by a reasoned explanation connecting the factual predicates to the ultimate conclusion, that opinion has no evidentiary value because an 'expert opinion is worth no more than the reasons upon

8.

which it rests.'" (*Jennings v. Palomar Pomerado Health Systems, Inc*. (2003) 114 Cal.App.4th 1108, 1117 (*Jennings*).) "An expert who gives only a conclusory opinion does not *assist* the jury to determine what occurred, but instead supplants the jury by *declaring* what occurred." (*Id*. at pp. 1117–1118.) Regarding causation, "the plaintiff must offer an expert opinion that contains a reasoned explanation illuminating why the facts have convinced the expert, and therefore should convince the jury, that it is *more probable than not* the negligent act was a cause-in-fact of the plaintiff's injury." (*Id*. at p. 1118.)

These rules apply to expert witness declarations submitted in connection with a motion for summary judgment. (*Powell, supra*, 151 Cal.App.4th at p. 123); *Bushling*, *supra*, 117 Cal.App.4th at p. 510.) "Cases dismissing expert declarations in connection with summary judgment motions do so on the basis that the declarations established that the opinions were either speculative, lacked foundation, or were stated without sufficient certainty." (*Sanchez v. Hillerich & Bradsby Co*. (2002) 104 Cal.App.4th 703, 718.) "[U]nder Evidence Code section 801, the trial court acts as a gatekeeper to exclude speculative or irrelevant expert opinion." (*Sargon, supra*, 55 Cal.4th at p. 770.) "[T]he gatekeeper's role 'is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" (*Id*. at p. 772.)

Plaintiff contends the trial court improperly sustained five of defendant's objections to Mobin's declaration: Objections Nos. 2, 3, 5, 6 and 7. In his briefs, plaintiff has not addressed each individual objection, but argues generally that there was a sufficient foundation for the opinions expressed, so that the objections should have been overruled. He argues that as long as the expert's declaration establishes the matters he relied on in expressing his opinion, and establishes that those matters are of the type that reasonably may be relied upon by an expert in forming an opinion upon the subject in

9.

issue, the opinion is admissible. (See Evid. Code, § 801.) He concludes that, because the declaration shows Mobin relied on his review of plaintiff's medical records and his own experience, education, training, and clinical practice as a neurosurgeon, that foundation was established and the declaration was sufficient. In light of the facts and supporting medical literature set out in or accompanying the expert declarations submitted by defendant, however, Mobin's declaration failed to demonstrate his opinions were based on matters that experts reasonably rely on in forming such opinions and failed to include a reasoned explanation connecting the factual predicates to the ultimate conclusion.

### C.   Objections

#### 1.   Objections Nos. 3, 5 and 6

Defendant's objections Nos. 3, 5 and 6 addressed the following language in Mobin's declaration.

> Objection No. 3, to a portion of paragraph 18: "Because every minute is essential to the recovery of a patient experiencing head trauma, the first hour, otherwise known as the 'golden hour' immediately following the brain injury is the most critical to the patient's ultimate recovery. The delay jeopardized the recovery because it led to ischemia."

> Objection No. 5, to a portion of paragraph 24: "The quicker a subdural hematoma patient gets to the hospital, the better the outcome. Because Moses did not transport Abraham Sanchez to the hospital immediately that delay not only contributed to a more severe brain injury than Abraham Sanchez would have suffered had he been taken to the hospital quicker, but also jeopardized Abraham's overall recovery."

> Objection No. 6, to paragraph 25: "Abraham arrived at Kern Medical Center at 10:16 p.m., at which [time] Abraham was rushed into a CT scan. Shortly thereafter, Abraham was administered Mannitol to decrease his brain swelling. Had Abraham been transported immediately upon Moses's initial contact at 9:25 p.m., there would have been a decrease in brain swelling, and thereby pressure, because the administration of Mannitol would have occurred much sooner."

Defendant objected on the grounds the statements lacked foundation and were conclusory and speculative. It also objected that the quoted portion of paragraph 18 (the

10.

subject of objection No. 3) was irrelevant, because plaintiff arrived at KMC within one hour of his first contact with the standby ambulance crew. Defendant referred to its experts' declarations, which presented detailed analyses of medical literature showing that delays of less than four hours before surgical treatment of a subdural hematoma, and more specifically delays less than 30 minutes, do not affect patient outcomes. It referred to federal case law that rejected the notion that quicker is necessarily better in neural injury cases, and noted Mobin provided no evidence to support that conclusion. Defendant stated plaintiff "failed to address or refute case law and expert testimony repudiating the conclusory connection between neural pressure and clinical outcome."

The undisputed evidence indicated the standby ambulance crew first contacted plaintiff at approximately 21:25. Moses called for a transport ambulance at 21:30. The transport ambulance crew first contacted plaintiff at 21:38, and the transport ambulance left the football field for the hospital by 21:42. Thus, a total of approximately 17 minutes elapsed between the time Moses arrived and began his assessment of plaintiff's condition and the time the transport ambulance left the scene with plaintiff, on its way to KMC.

Mobin's statement in paragraph 25 (the subject of objection No. 6) indicates his opinion was based on a belief plaintiff should have "been transported immediately upon Moses's initial contact at 9:25 p.m." (i.e., at 21:25). But that assumption is not supported by the admitted facts of this case. It ignores the time it took Moses to determine that plaintiff should be transported to the hospital—approximately five minutes between first contact and his call to have a transport ambulance dispatched. Plaintiff does not contend that time constituted undue delay. In fact, plaintiff submitted the expert declaration of Robert Krause, a certified paramedic, who opined that a paramedic responding to an emergency situation must conduct both a primary survey and a secondary survey of the patient in order to determine and properly respond to the patient's condition. He concluded Moses failed to perform a complete primary survey and failed to conduct a

thorough secondary survey. If anything, plaintiff's theory of liability would have required that Moses spend more time assessing plaintiff's condition.

Mobin's opinion also ignored the time the standby ambulance crew spent applying spinal precautions prior to transporting plaintiff. Plaintiff admitted it was appropriate for the standby crew to take those precautions. The exact time spent on the precautions is not known, but between 21:30 and 21:38 the standby crew applied the precautions, loaded plaintiff into the standby ambulance, and drove to the northeast corner of the football field to meet the transport ambulance. Thus, the spinal precautions took something less than eight minutes. Defendant submitted the expert declaration of Charles Flack, a licensed paramedic, who referred to an article in which the authors observed 20 different teams of experienced paramedics and measured the time required for spinal immobilization. "[T]he mean time required for proper spinal immobilization was $5.64 \pm 1.49$ minutes. The minimum time was 3.07 minutes and the maximum was 8.41 minutes." Defendant computed an approximate two and one-half minute delay, that might be considered unnecessary, by deducting from the eight minutes between 21:30 and 21:38 the approximate median time to complete the spinal precautions (five & one-half minutes).

Although Mobin declared that he reviewed various materials, including plaintiff's hospital records and some depositions, his declaration did not set out any of the relevant time periods, except that Moses first contacted plaintiff at 21:25 and plaintiff arrived at KMC at 22:16.[3] Mobin repeatedly referred to the "delay," without defining that term. He did not limit his opinions to "unnecessary" delay, explain which delays he attributed to defendant's gross negligence, or specify the length of the delay on which he based his opinions.

---

**3** Defendant's records indicated plaintiff arrived at KMC at 22:12. The parties agreed the emergency room personnel took him into their custody at 22:13 and he arrived at the trauma room at 22:16.

12.

Mobin's declaration identified the materials he reviewed as the basis for his opinion. They did not include the Flack declaration, in which Flack set out defendant's calculations of the time period that might be considered unnecessary delay. Mobin did not respond to or refute those time calculations.

Mobin's declaration reflects that he did review the declaration of defendant's expert, Dr. David Schriger, a physician board certified in emergency medicine. Schriger declared that he "reviewed the world's research literature on the effect of time-to-surgery upon patient outcome in subdural hematoma." He summarized the results of this research and found the concept that "faster is better" was not substantiated by the medical literature. He concluded there was "no evidence in the literature to support the notion that delays in treatment in the range of 0 to 30 minutes affect patient outcome in cases of subdural hematoma." (Italics omitted.) Schriger estimated that the amount of time in issue—the difference between the time of arrival at KMC if plaintiff had been transported by the standby ambulance and the actual time of arrival—was two to 10 minutes. He concluded there was "absolutely no published evidence that a difference of this magnitude matters" or that it would result in a worse outcome. Mobin did not discuss Schriger's analysis or opinion.

Mobin did not review the declaration of Dr. Jeff Victoroff, a neurologist, whose expert declaration was also submitted by defendant. Victoroff observed that it would be unrealistic to expect the standby ambulance to immediately transport plaintiff at 21:25, without assessing him, declaring an emergency, applying spinal precautions, and loading him into the standby ambulance. Although he stated the actual delay from the use of two ambulances was probably considerably less than the 23 minutes between Moses's first contact with plaintiff and the activation of a Code 3 at 21:48, at the request of counsel, he considered whether a rational and informed fact finder could trace any increased severity in plaintiff's outcome to a delay in transport of up to 30 minutes.

13.

Based on his own review of the literature, Victoroff endorsed Schriger's conclusion that there was "'no evidence in the literature to support the notion that delays in treatment in the range of 0 to 30 minutes affect patient outcome in cases of subdural hematoma.'" He added his own analysis of the medical literature and research studies and concluded they "roughly agree: it is probably better to get acute symptomatic [subdural hematoma] patients to the operating room within 4 hours." Plaintiff underwent surgery two hours 50 minutes after onset of symptoms of a severe head injury, and the greatest part of this time was the one and one-half hours between diagnosis at KMC and the start of surgery. Victoroff opined: "By comparison, the time consumed transferring between ambulances was trivial. [¶] … No scientific evidence whatsoever exists to support the contention that a difference of 5, 10, or even 30 minutes in [a subdural hematoma] patient's arrival time will make the slightest difference in outcome." Victoroff concluded, to a reasonable degree of medical certainty, that a transport delay of up to 30 minutes did not cause any difference in plaintiff's outcome. "The gut instinct that 'sooner is better; every minute counts' in intervention after acute [subdural hematoma] has never been supported by a single medical study in humans or any other species. No study, using any measure of outcome, has ever shown that a 30-minute delay in arrival at the hospital makes the slightest difference in outcome."

Mobin's declaration indicates he did not review the declarations of Flack and Victoroff. Although it indicated he reviewed Schrager's declaration, Mobin did not respond to the content of that declaration. He did not controvert Schrager's analysis of the medical literature or the conclusions Schrager drew from it. Mobin did not provide any contrary medical literature or evidence supporting a different conclusion. He did not explain why he reached a different conclusion. In the challenged portions of paragraphs 18, 24, and 25, Mobin simply asserted the "golden hour" is critical and the "quicker the subdural hematoma patient gets to the hospital, the better the outcome"; he then opined that the "delay," which he apparently defined as the entire time from 21:25

14.

until the transport ambulance departed the scene, "contributed to a more severe brain injury than if he had been taken to the hospital quicker."

Mobin's opinion that plaintiff should have been transported immediately at 21:25 is not supported by the undisputed facts of this case. It was undisputed that it was necessary for the paramedic, Moses, to assess plaintiff's condition before determining the appropriate steps to take for his care; it was also undisputed that the spinal precautions the standby crew took before transporting plaintiff were appropriate. Thus, the only delay in issue was the time spent transferring plaintiff from one ambulance to the other prior to transporting him to the hospital. Mobin did not establish that his opinions were based solely on this period of alleged delay.

Plaintiff contends that, "[i]n light of the rule of liberal construction, a reasoned explanation required in an expert declaration filed in opposition to a summary judgment motion need not be as detailed or extensive as that required in expert testimony presented in support of a summary judgment motion or at trial." The cases cited by plaintiff in support of this statement, *Jennifer C. v. Los Angeles Unified School Dist.* (2008) 168 Cal.App.4th 1320 (*Jennifer C.*) and *Powell*, *supra*, 151 Cal.App.4th 112, did conclude that expert declarations opposing summary judgment need not be as detailed as those offered in support of it. However, they are distinguishable.

In *Jennifer C.*, the plaintiff, a special needs student with a mental disability, was approached by another special needs student during lunch break; she accompanied him to a secluded area of the campus, where he sexually assaulted her. (*Jennifer C., supra,* 168 Cal.App.4th at p. 1324.) The school district moved for summary judgment, with evidence that tended to show adequate supervision: the school had placed bright yellow chains around the alcove where the assault occurred, to indicate it was off limits; the student body had been informed the area was off limits; 19 school employees and volunteer parents provided supervision during lunchtime; four were assigned to supervise the area where the assault occurred; one checked the alcove every six minutes during

lunch; school employees were not aware of any prior sexual assaults or other illicit activity during school hours in the alcove area. (*Id*. at pp. 1325, 1330.) In opposition, the plaintiff submitted the declaration of an expert in school safety and supervision, who critiqued the supervision; he opined that, if the supervision had been done in a reasonable manner, he would have expected that the students would have been found earlier or intercepted on the way to the alcove. (*Id*. at p. 1330.) The expert stated the plaintiff was particularly vulnerable to sexual assault, required close supervision, and would not have understood the significance of the yellow chains. (*Id*. at p. 1331.) In support of his opinions, the expert relied on his experience, the facts surrounding the incident, the plaintiff's individualized educational plans, her psychological assessments, and other school records. (*Id*. at pp. 1331, 1333.) On appeal, applying a liberal construction, the court found the expert's opinions were adequately supported by a reasoned explanation, were not conclusory, and should not have been excluded. (*Id.* at p. 1333.)

In *Powell*, the plaintiff sued the defendants for medical malpractice after they allegedly failed to promptly diagnose and treat an injury to his spinal cord. (*Powell*, *supra*, 151 Cal.App.4th at p. 115.) Defendant Kleinman moved for summary judgment, submitting the declaration of an expert, based on his review of the medical records and depositions, stating that Kleinman's treatment of the plaintiff was reasonable, met the applicable standard of care, and did not cause the plaintiff's injuries. (*Id*. at p. 118.) In opposition, the plaintiff submitted an expert declaration by Dr. Meub, based on review of the medical records and depositions, opining that Kleinman breached the standard of care by failing to recognize weakness as a sign of spinal cord compromise, failing to obtain the results of a magnetic resonance imaging test (MRI) performed four days earlier, and assuming, without confirmation, that hospital staff had tested for spinal cord compromise. (*Id*. at p. 119.) The trial court sustained defendant's objections to Meub's declaration on grounds including lack of foundation and lack of supporting evidence and granted summary judgment. (*Id*. at pp. 119–121.)

Applying the rule of liberal construction to Meub's declaration in opposition to the motion for summary judgment, we concluded two of the defendant's objections were properly sustained because the opinions expressed were not based on the facts and evidence presented. (*Powell*, *supra*, 151 Cal.App.4th at p. 126.) However, two paragraphs of the declaration to which objections were sustained, which addressed Kleinman's failure to obtain the results of an MRI and his assumption that hospital staff had tested for spinal cord compromise, were reasonably based on inferences from the medical records and undisputed facts. (*Id*. at pp. 127–128.) Because these two paragraphs raised triable issues of material fact regarding both breach of duty and causation, summary judgment was precluded. (*Id*. at pp. 129–130.)

Unlike the situation in this case, in *Jennifer C*. and *Powell*, the expert in issue did not assume facts contrary to the undisputed facts of the case. Further, in those cases the moving papers did not include expert declarations making a prima facie showing that the medical literature refuted the assumptions on which the opponent's expert opinions were based, leaving those opinions without a foundation upon which reasonable experts in the same field would rely. When the moving papers undermine the assumptions on which the opposing expert's opinion is based, the opposing expert must do more than simply assert those discredited assumptions in order to meet the admissibility requirements of Evidence Code section 801, subdivision (b).

In light of the evidence presented by the defense experts, Mobin's declaration failed to show that his conclusions regarding causation—that the delay jeopardized plaintiff's recovery and contributed to a more severe brain injury—were "[b]ased on matter … that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates." (Evid. Code, § 801, subd. (b).) This was not a case in which the experts relied on different medical studies or different interpretations of the medical literature to support their opinions; in such a case, the court on summary judgment cannot weigh the merits of the opinions or their foundations, but must leave

17.

that task to the trier of fact. (*Garrett v. Howmedica Osteonics Corp.* (2013) 214 Cal.App.4th 173, 186–187.) Rather, the defense experts challenged the bases of Mobin's opinions and showed the assumptions on which the opinions were founded were not valid, according to the medical literature. Mobin made no contrary showing. Plaintiff did not refute defendant's showing that Mobin's opinions were based on assumptions of fact without evidentiary support or on speculative or conjectural factors. Such expert opinions have no evidentiary value and may be excluded from evidence. (*Sargon*, *supra*, 55 Cal.4th at p. 770; *Bushling*, *supra*, 117 Cal.App.4th at p. 510.)

In *Shiffer v. CBS Corp.* (2015) 240 Cal.App.4th 246 (*Shiffer*), the plaintiff sued the successor of Westinghouse, alleging he developed mesothelioma from exposure to Westinghouse asbestos at a power plant in 1969. (*Id.* at p. 248.) Defendant conceded that insulation for the turbine generator and certain related piping, installed at the plant in 1969, contained Westinghouse asbestos. (*Id.* at p. 249.) In his deposition, the plaintiff testified that, when he arrived at the power plant in 1969, construction was in its last stages and the main turbine insulation had already been installed. (*Ibid.*) He observed some drains and smaller auxiliary lines being insulated, but his workstation was in another building. (*Ibid.*) In his declaration in opposition to the defendant's motion for summary judgment, the plaintiff was less specific about what work was already completed or still in progress upon his arrival. (*Id.* at p. 250.)

The plaintiff's experts opined that he was exposed to hazardous levels of respiratory asbestos during work on the turbines and this exposure was a substantial factor contributing to the plaintiff's total aggregate exposure to asbestos. (*Shiffer*, *supra*, 240 Cal.App.4th at p. 250.) The experts had not reviewed the plaintiff's deposition testimony, however. The trial court excluded or did not consider the expert opinions on the grounds they lacked foundation and were speculative. (*Ibid.*) It granted the defendant's motion for summary judgment.

18.

The reviewing court affirmed, finding the plaintiff's evidence insufficient to raise a triable issue of material fact. (*Shiffer*, *supra*, 240 Cal.App.4th at p. 254.) There was no evidence the plaintiff was in the turbine room when the asbestos-containing insulation for the turbine and related piping was installed, or that the insulation the plaintiff observed being installed was part of the asbestos-containing insulation. (*Id.* at p. 252.) The plaintiff's experts did not have his deposition testimony, but only his less detailed declaration. "Thus, the experts, whose opinions on causation were essential to Shiffer's case [citations], considered a significantly incomplete universe of information, leaving them without an adequate basis to conclude, as [two of them] did, that Shiffer's exposure to Westinghouse-related asbestos was hazardous and a substantial cause of his mesothelioma. An expert's opinion is only as good as the facts on which it is built." (*Id.* at p. 253.) The problem was foundational and the trial court did not err in excluding the experts' opinions. (*Id.* at p. 254.)

Mobin similarly considered a significantly incomplete universe of information. He did not review Flack's analysis of the timing of events or Victoroff's analysis of relevant medical literature. He also apparently did not take into account the undisputed evidence that much of the time between Moses's first contact with plaintiff and the departure of the transport ambulance for the hospital was spent appropriately on assessment of plaintiff's condition and application of spinal precautions. Rather, he assumed, without evidentiary support, that the entire period from Moses's first contact with plaintiff to the departure of the transport ambulance from the football field constituted unnecessary delay attributable to the wrongful conduct of defendant. He also assumed, in the face of the defense experts' medical literature to the contrary and without challenging that literature in any way, that any delay in reaching the hospital increased the severity of plaintiff's outcome.

The trial court could reasonably have concluded Mobin's opinions as expressed in these challenged paragraphs were based on assumptions of fact without evidentiary

19.

support, were speculative or conjectural, and lacked a reasoned explanation of why the facts led to Mobin's conclusion regarding causation. Accordingly, we conclude the trial court did not abuse its discretion in sustaining defendant's objections to the challenged portions of paragraphs 18, 24, and 25 of Mobin's declaration.

### 2. Objection No. 2

Defendant's objection No. 2 challenged the following statement by Mobin in paragraph 17 of his declaration:

> "According to [plaintiff's] CT scans it is clear that [plaintiff] suffered a posterior artery stroke on the date of the incident as a result of the brain herniation from the delay in transport."

Defendant objected that the statement was conclusory, lacked foundation, and assumed facts without evidentiary support. Defendant challenged both Mobin's conclusion that the stroke occurred on the date of the incident and his conclusion it was caused by a delay in transport.

Defendant's experts, Victoroff and Dr. Greg Zaharchuk, a neuroradiologist, addressed the issue of the stroke. Zaharchuk reviewed plaintiff's medical records and other materials, including the radiological images from various CT scans. He stated CT scans of plaintiff's head, performed on October 2, 2009, at 22:34 and October 3, 2009, at 08:09 did not show a posterior cerebral artery (PCA) stroke. It was first visible on a CT scan performed days later, on October 8, 2009, at 10:03. Zaharchuk opined that there was "nothing in the radiological findings from which anyone could reasonably conclude that it is more likely than not that [plaintiff] suffered his PCA stroke prior to completion of the craniotomy at 0258 on 10/3/09." He based this conclusion on the size of the stroke and the fact that most strokes of this type and size "will be apparent on a CT scan within 5 hours of onset." Since there was a time lapse of five hours between completion of the craniotomy and the October 3, 2009, CT scan, "a stroke occurring prior to the completion of surgery would more likely than not have been visible on the scan."

20.

Victoroff agreed that the October 8 CT scan was the first to show the PCA stroke. He then considered in detail the likelihood the stroke occurred during different time periods, including the time period between injury and clinical deterioration (approximately 21:45), between clinical deterioration and receipt of mannitol (at 23:00), between receipt of mannitol and commencement of surgery, during the surgery itself, between completion of surgery and the October 3 CT scan, and between the October 3 CT scan and the October 8 CT scan. Victoroff asserted there was no current scientific strategy to determine exactly when a stroke occurred. He stated most strokes are visible on CT scans within six hours, and discussed the medical literature supporting this statement. He concluded that, if the stroke occurred at any time before plaintiff's surgery, it was more probable than not that the stroke would have been visible on the CT scan on the morning of October 3, 2009.

Regarding the cause of the PCA stroke, Zaharchuk expressed his opinion "that there is nothing in the radiological findings from which a rational fact finder could conclude that it is more likely than not that but for a delay of up to 30 minutes in transporting [plaintiff] to Kern Medical Center, his outcome would have been less severe." He explained the basis for this opinion, then concluded: "Therefore, the contention that [plaintiff's] outcome was somehow made worse by a short delay in transport to the hospital cannot be squared with the imaging findings and clinical history."

Victoroff opined that, even if the stroke occurred prior to initiation of treatment at the hospital, there were no studies showing that the outcome from a posttraumatic stroke would be different if efforts were made to reduce intracranial pressure 10 to 30 minutes sooner. He stated that, even assuming the PCA stroke occurred prior to surgery (contrary to the most probable medical inferences), there was no way to measure how many neurons were lost as a result of delay and no way to correlate lost neurons to any measure of patient outcome.

21.

Mobin's declaration explained that a subdural hematoma is a collection of blood in the space between the membranes covering the brain. The accumulated blood exerts pressure, shifting the intracranial contents away from the subdural hematoma. As the pressure increases, it impedes the blood and oxygen supply to the rest of the brain, which leads to further brain swelling. When the pressure reaches a critical level, the brain is forced through small orifices at the base of the skull, causing progressive decline in neurological function. Ultimately, the part of the brain that herniates through the skull base openings will cease to function.

Mobin opined that the signs and symptoms reflected in the KMC "Trauma History and Physical," dated October 2, 2009, at 22:30, were consistent with brain herniation syndrome and plaintiff was facing impending brainstem herniation and brain death. "As a consequence of the downward brain herniation, the arteries at the base of the brain can be compressed, resulting in stroke of the corresponding parts of the brain. According to [plaintiff's] CT scans it is clear that [plaintiff] suffered a posterior artery stroke on the date of the incident as a result of the brain herniation from the delay in transport."

To be admissible, an expert's opinion must be "[b]ased on matter … that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates." (Evid. Code, § 801, subd. (b).) It must not be based on assumptions of fact without evidentiary support or be purely conclusory because unaccompanied by a reasoned explanation connecting the factual predicates to the ultimate conclusion. (*Jennings*, *supra*, 114 Cal.App.4th at p. 1117.) An opinion as to causation must contain "a reasoned explanation illuminating why the facts have convinced the expert, and therefore should convince the jury, that it is *more probable than not* the negligent act was a cause-in-fact of the plaintiff's injury." (*Id*. at p. 1118.)

Even if we liberally construe Mobin's statement that it was clear from the CT scans that plaintiff suffered a stroke on the date of the incident to mean that he disputed Zaharchuk's and Victoroff's statements that the stroke was not visible on the CT scans

22.

taken October 2 and 3, 2009, the remainder of his statement–that the stroke was the result of the delay in transport–is not supported by a reasoned explanation.

With its motion for summary judgment, defendant presented a timeline based on the recorded times at which various events occurred. Defendant's timeline and time calculations showed that, before the standby crew turned plaintiff over to the transport crew, the only arguably unnecessary or undue delay consisted of approximately two and one-half minutes not spent assessing plaintiff's condition or applying spinal precautions. Thereafter, the transport crew spent 30 minutes transporting plaintiff, then he was taken into the custody of the emergency room personnel. Forty-seven minutes later, mannitol was administered by KMC personnel. One hour 35 minutes after that, surgery to evacuate the subdural hematoma began. Thus, a total of two hours 50 minutes elapsed between Moses's first contact with plaintiff and the commencement of surgery.

Mobin provided no reasoned explanation supported by facts for his conclusion that the stroke was "a result of the brain herniation from the delay in transport." Despite plaintiff's admission of the times at which the relevant events occurred, Mobin did not address defendant's timeline. He did not contradict defendant's time calculations or state the length of delay he opined resulted in plaintiff's PCA stroke. He did not opine that a two and one-half minute delay (or any other length of delay arguably supported by the evidence) in transporting plaintiff from the scene of the injury to the hospital caused the PCA stroke. Mobin did not address the effect of the 30-minute ambulance ride, explain whether it was included in his reference to "delay," or explain why the stroke would be attributable to the two and one-half minute delay in commencement of the ambulance ride, rather than to the 30-minute ride itself or subsequent time periods at the hospital.

Mobin's declaration indicates he did not review Victoroff's declaration. Accordingly, he did not address or refute the evidence that there is no current scientific strategy for determining exactly when a stroke happened, posttraumatic strokes on average occur about a day after the traumatic brain injury, there is no clinical or

23.

radiological evidence from which anyone could reasonably conclude it is more likely than not that plaintiff suffered the stroke before his craniotomy, and there is no way to measure outcome to show it was worse because of a delay in treatment.

Mobin's declaration did not demonstrate that his opinion regarding causation was based on matters on which experts reasonably rely. (Evid. Code, § 801, subd. (b).) The opinion was not accompanied by a reasoned explanation connecting the factual predicates to the ultimate conclusion. (*Bushling*, *supra*, 117 Cal.App.4th at p. 510.) Consequently, the trial court did not abuse its discretion by sustaining defendant's objection No. 2 to Mobin's declaration.

### 3. Objection No. 7

Defendant's objection No. 7 addressed paragraph 26 of Mobin's declaration:

"Given the mechanism of 'Helmet-to-helmet injury' and his complaint of headache, [plaintiff] would have undergone a head CT on arrival to the hospital and the subdural hematoma would have been diagnosed prior to his severe neurological deterioration. Aaron Moses' action directly caused delay in diagnosis and caused severe deterioration in [plaintiff's] neurological condition in the field."

Defendant objected the statement was conclusory, speculative, and lacking foundation without supporting evidence. It asserted that plaintiff contended his condition deteriorated by 21:38, when the transport crew took over his care, and both parties agreed he had deteriorated by 21:45, when the transport crew noted a change in his condition which resulted in upgrading the call to a Code 3 lights and sirens emergency. Consequently, it would have been impossible to perform a CT scan at the hospital before plaintiff's clinical deterioration.

Mobin's declaration states plaintiff "deteriorated in the field" and rapidly deteriorated "at the scene, prior to transport to" KMC. It is undisputed it took the ambulance 30 minutes to reach KMC. Consequently, Mobin's conclusion that plaintiff "would have undergone a head CT on arrival to the hospital and the subdural hematoma

would have been diagnosed prior to [plaintiff's] severe neurological deterioration" is not supported by the undisputed facts. It is undisputed that plaintiff did undergo a CT scan after arrival at the hospital and was diagnosed with a subdural hematoma. Given Mobin's contention plaintiff's condition deteriorated before his ambulance trip, it would be logically impossible for the CT scan to have been performed and the diagnosis to have been made before plaintiff's condition deteriorated, even if the ambulance had left the football field with plaintiff at 21:25, as Mobin suggested. Plaintiff still would have arrived at the hospital at 21:55, after the deterioration occurred (which was sometime prior to transport at 21:42, according to Mobin).

The remaining sentence of the challenged paragraph suffers from the same problem. Mobin does not explain how a delay in diagnosis at the hospital could have caused deterioration "in the field," or how eliminating a two and one-half minute delay in commencing the half-hour trip to KMC would have avoided the "rapid" and "severe" deterioration "in the field."

In light of the lack of foundation for the opinions expressed, the trial court did not abuse its discretion by sustaining defendant's objection No. 7 to Mobin's declaration.

## IV. Summary Judgment

One of the essential elements of a cause of action alleging negligence or gross negligence is causation, that is, that the defendant's negligence was a substantial factor in causing the plaintiff's harm. (CACI No. 400; *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 286–287; *Anderson v. Fitness Internat., LLC* (2016) 4 Cal.App.5th 867, 881 [gross negligence differs from ordinary negligence only in degree, not in kind].) "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm." (CACI No. 430.) "[A] tortfeasor may be held liable in an action for damages where the effect of his negligence is to aggravate a preexisting condition or disease. Plaintiff may recover to the full extent

25.

that his condition has worsened as a result of defendant's tortious act." (*Ng v. Hudson* (1977) 75 Cal.App.3d 250, 255, overruled on another ground in *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574, 580.)  Here, plaintiff seeks to recover from defendant for the alleged aggravation or worsening of his condition as a result of the alleged gross negligence of defendant in its care and treatment of plaintiff after his football injury.

In its motion for summary judgment, defendant attempted to show that plaintiff could not establish either a breach of duty (i.e., gross negligence) or causation.  The trial court found that plaintiff failed to raise a triable issue of material fact on the issue of causation.  It found plaintiff failed to present any admissible evidence contesting defendant's evidence that any delay in transport to the hospital did not make plaintiff's condition worse.  Further, there was no admissible evidence plaintiff should have been transported at 21:25; he arrived at KMC 47 to 48 minutes after Moses's initial contact, within the "golden hour" espoused by plaintiff.  Additionally, the trial court stated it was uncertain when the PCA stroke occurred; defendant offered neuroradiological evidence that it more likely than not occurred after surgery, so any delay in transport could not have affected its onset or severity.  Plaintiff did not submit any admissible evidence contesting that evidence.  Moreover, even if the stroke occurred prior to surgery, there was no admissible evidence it was caused or made worse by any delay in transport.

Plaintiff does not contend defendant failed to meet its initial burden of producing evidence to make a prima facie showing that the undisputed facts entitled it to judgment as a matter of law.  (*McGonnell*, *supra*, 98 Cal.App.4th at p. 1103.)  Rather, plaintiff contends he met his burden of showing the existence of a triable issue of fact in response.  (*Ibid.*)  "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar, supra,* 25 Cal.4th at p. 850, fn. omitted.)  Plaintiff's argument that his opposition to the motion for summary judgment raised triable issues of material fact on the issue of causation relies on

the excluded portions of Mobin's declaration.  He does not argue that, in the absence of the excluded evidence, he nonetheless raised a triable issue of material fact as to causation.

The trial court properly excluded the portions of Mobin's declaration in which he concluded that the quicker a subdural hematoma patient gets to the hospital, the better the outcome, and that the delay in transporting plaintiff to the hospital, which Mobin opined began at 21:25, contributed to a more severe brain injury and caused the PCA stroke. Plaintiff cannot rely on those opinions to demonstrate the existence of a triable issue of fact.

Mobin's declaration referred to "delay" and "delay in transport," without defining the period he included in that reference or its length.  In light of his reference in paragraph 25 to transporting plaintiff immediately at 21:25, it appears Mobin's opinions were based on an assumption the pertinent delay was at least the entire period (17 minutes) between Moses's first contact with plaintiff and the departure of the transport ambulance from the football field.  Mobin expressed no opinion that the two and one-half minute delay demonstrated by defendant in its motion, based on undisputed evidence, caused or contributed to a worsening of plaintiff's outcome.  He expressed no admissible opinion that the brief delay caused plaintiff's PCA stroke.  Mobin did not challenge the medical literature on which defendant's expert opinions on causation were based, or provide studies reaching a different result.  He did not dispute defendant's expert opinions that the published medical literature does not support a conclusion that a delay of up to 30 minutes in arriving at the hospital would result in a worse outcome.

Plaintiff has not demonstrated that he raised a triable issue of material fact on the issue of causation.  Accordingly, we find no reversible error.

## V.     Motion for Sanctions

Defendant filed a motion for sanctions against plaintiff's attorneys for the filing of a frivolous appeal (citing Code Civ. Proc., §§ 437c, subd. (j), 907; Cal. Rules of Court,

27.

rule 8.276; Rules Prof. Conduct, rule 3–200).  The motion asserts plaintiff's attorneys "are pursuing a manifestly unserious appeal."  Defendant contends Mobin's declaration was "a sham," "transparently baseless," and "introduced in bad faith for purposes of delay," and plaintiff's counsel are experienced appellate attorneys who should have known the Mobin declaration was insufficient to address the epidemiological research presented by defendant's experts.  Defendant states that, before plaintiff filed his opening brief, defendant offered to forgive the $88,904.81 cost award imposed against plaintiff in exchange for dismissal of the appeal, but plaintiff's attorneys did not respond.  It suggests a fitting sanction would be to require plaintiff's counsel to pay the cost award to defendant on plaintiff's behalf.

"When it appears to the reviewing court that the appeal was frivolous or taken solely for delay, it may add to the costs on appeal such damages as may be just."  (Code Civ. Proc., § 907.)  A party may move the Court of Appeal to impose sanctions against a party or an attorney for "[t]aking a frivolous appeal or appealing solely to cause delay."  (Cal. Rules of Court, rule 8.276(a)(1).)  The standards for determining whether an appeal is frivolous are contained in *In re Marriage of Flaherty* (1982) 31 Cal.3d 637 (*Flaherty*).  "[A]n appeal should be held to be frivolous only when it is prosecuted for an improper motive—to harass the respondent or delay the effect of an adverse judgment—or when it indisputably has no merit—when any reasonable attorney would agree that the appeal is totally and completely without merit."  (*Id*. at p. 650.)  This "definition must be read so as to avoid a serious chilling effect on the assertion of litigants' rights on appeal.  Counsel and their clients have a right to present issues that are arguably correct, even if it is extremely unlikely that they will win on appeal.  An appeal that is simply without merit is *not* by definition frivolous and should not incur sanctions."  (*Ibid*.)  Sanctions "should be used most sparingly to deter only the most egregious conduct."  (*Id*. at p. 651.)

We do not find that plaintiff's appeal meets this standard of frivolousness.  While we have concluded the appeal lacks merit, it does not appear to have been taken for any

improper purpose, such as delay. We do not find it was so clear from the facts of this case and the existing case law that the Mobin declaration was insufficient to raise a triable issue of fact in opposition to defendant's motion for summary judgment that "any reasonable attorney" would have concluded it was insufficient. (*Flaherty*, *supra*, 31 Cal.3d at p. 650.) Accordingly, we do not find the appeal was so obviously lacking in merit that any reasonable attorney would agree it was totally and completely without merit. (*Ibid*.) Therefore, we deny defendant's motion for sanctions.

### *DISPOSITION*

The judgment is affirmed. Defendant is entitled to its costs on appeal.


_____
                      HILL, P.J.

WE CONCUR:


_____
POOCHIGIAN, J.


_____
DETJEN, J.

## CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ABRAHAM SANCHEZ, JR.,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>KERN EMERGENCY MEDICAL TRANSPORTATION CORPORATION,<br><br>    Defendant and Respondent. | F069843<br><br>(Super. Ct. No. S-1500-CV-270098)<br><br>**ORDER** |

It appearing that part of the nonpublished opinion filed in the above entitled matter on January 13, 2017, hereby meets the standards for publication specified in California Rules of Court, rule 8.1105(c), IT IS ORDERED that the opinion be certified for publication in the Official Reports with the exception of section V. Motion for Sanctions.

HILL, P. J.

WE CONCUR:

POOCHIGIAN, J.

DETJEN, J.