Filed 1/31/20

**CERTIFIED FOR PARTIAL PUBLICATION**\*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SAN FRANCISCO PRINT MEDIA COMPANY,<br><br>　　　Plaintiff and Appellant,<br><br>v.<br><br>THE HEARST CORPORATION et al.,<br><br>　　　Defendants and Respondents. | A152930<br><br>(City & County of San Francisco<br>Super. Ct. No. CGC13532369) |

Plaintiff San Francisco Print Media Company, owner of the San Francisco Examiner (the Examiner), sued the corporate owner, a subsidiary, and employees of the San Francisco Chronicle (the Chronicle), claiming, in sum, that defendants sold a certain type of print advertising in the Chronicle at prices that violated California's Unfair Practices Act (UPA, Bus. & Prof. Code, § 17000 et seq.[1]) and Unfair Competition Law (UCL, § 17200 et seq.). Plaintiff now appeals from judgment after the trial court granted defendants' motion for summary judgment.

This case turns in part on the application of *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747 (*Sargon*), which sets out standards concerning the admissibility of expert opinion testimony. In the published portion of this decision, we conclude the trial court properly granted summary judgment as to plaintiff's cause of action for below-cost sales under the UPA (§ 17043) after granting defendants'

---

\*　Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts B, C, and D of the Discussion.

[1]　Unless otherwise stated, subsequent statutory references are to the Business and Professions Code.

1

*Sargon* motion and excluding the opinion of plaintiff's expert on costs. Among other things, plaintiff had disclaimed reliance on specific transactions to prove the Chronicle's alleged underpricing of its print advertising, leaving only the aggregate cost analysis prepared by that expert to establish the occurrence of alleged below-cost sales. As the trial court correctly determined, however, the record established that plaintiff's expert lacked the foundational knowledge to conduct the requisite cost analysis and that he based his analysis on another individual's non-UPA-related pricing analysis without understanding its foundations, such as some of the included cost components.

In the unpublished portion of this decision, we conclude summary judgment was properly granted as to plaintiff's cause of action for unlawful use or sale of loss leaders under the UPA (§ 17044) because plaintiff failed to identify the loss leader sales on which this claim was based. We further conclude in the unpublished portion that the trial court did not err in granting summary judgment on plaintiff's cause of action for secret and unearned discounts under the UPA (§ 17045) and its UCL cause of action.

The judgment is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Plaintiff's Lawsuit

In June 2013, plaintiff filed its original complaint against the Chronicle's corporate owner and a subsidiary, Hearst Corporation and Hearst Communications, Inc., and three Chronicle employees. The operative third amended complaint alleged three causes of action under the UPA: below-cost sales (§ 17043); unlawful use or sale of loss leaders (§ 17044); and secret and unearned discounts (§ 17045). The complaint also alleged defendants violated the UCL (§ 17200) by its conduct violating the UPA. Plaintiff sought damages and injunctive relief.

The conduct underlying all these causes of action was, in essence, the Chronicle's alleged underpricing of its full-run run-of-press print advertising[2] beginning in 2011,

_____

[2] "Run-of-press" means print display advertisements in a newspaper, as opposed to newspaper inserts or classified advertisements, or advertisements in other print media (such as magazines). "Full run" means the advertisements appearing in the generally

2

when plaintiff bought the Examiner. During the course of the litigation, defendants had a protracted discovery dispute with plaintiff, trying to ascertain the specific advertisers at issue in the case. Then, in a December 2016 joint case management statement, plaintiff asserted its expert, Richard Eichmann, would testify about "costs, causation, and damages" by analyzing all of the Chronicle's print advertising transactions, not just particular transactions, to show the Chronicle sold below cost, and by conducting a statistical analysis to show the economic injury caused by the Chronicle's below-cost pricing and to calculate the Examiner's estimated lost profits. In light of Eichmann's methodology, plaintiff represented that defendants' proposed depositions of particular advertisers were unnecessary and irrelevant. In the same joint case management statement, defendants responded, based on plaintiff's representations, that they did not intend to depose the hundreds of advertisers they initially thought they would. Defendants said that after completing expert discovery, they would file a *Sargon* motion challenging the admissibility of Eichmann's expert opinion testimony and a summary judgment motion. Before discussing these motions, we summarize Eichmann's expert evidence.

## B. Plaintiff's Expert, Richard Eichmann

Plaintiff's expert, Eichmann, an economist and economic consultant, authored his initial report in November 2016. As relevant here, Eichmann first calculated the Chronicle's "fully allocated cost"[3] for print advertising. Then comparing that amount to

---

distributed newspaper, as opposed to advertisements that are "part run" or "zoned" to appear only in "zoned" editions of the newspaper. The record reflects that plaintiff asserted the only product at issue in this case was full-run run-of-press (FRROP) print advertising. For the sake of brevity, we will refer to the FRROP print advertising simply as "print advertising."

[3]     This will be discussed further below, but for context we note here the occurrence of a below-cost sale is an element of the section 17043 and section 17044 causes of action (CACI Nos. 3301 & 3302), and the UPA employs a "fully allocated cost" standard to determine if a sale is below cost. (*Turnbull & Turnbull v. ARA Transportation, Inc.* (1990) 219 Cal.App.3d 811, 819–820 (*Turnbull*).) "The concept of fully allocated cost has been equated with average total cost, which 'reflects that portion of the firm's total

what he calculated was the average price paid for print advertising in the Chronicle, he concluded that a majority of the Chronicle's advertising customers paid below cost for a majority of advertising between 2011 and 2015.  Second, Eichmann conducted a regression analysis using information about print advertising sales from the two newspapers, devising an equation to statistically estimate the relationship between the Examiner's advertising revenue with its own print advertising prices and the Chronicle's print advertising prices (also referred to as the own-price elasticity of demand and cross-price elasticity of demand, respectively).  With these elasticity estimates derived from the regression analysis, Eichmann opined that the Examiner lost millions of dollars in profits from 2012 onward due to the Chronicle's below-cost pricing.  Third, Eichmann purported to corroborate the results of his regression analysis with a "yardstick" analysis that estimated what the Examiner's print advertising revenue would have been had it realized nationwide industry growth rates for newspaper advertising revenue.

Defense expert Daniel Rubinfeld filed a report criticizing Eichmann's analyses on numerous grounds.  Conceding the validity of Rubinfeld's criticism that he used incorrect data in his regression analysis, Eichmann submitted a supplemental report in April 2017 in which he updated his regression analysis and re-evaluated damages.  Eichmann concluded his updated analysis supported his earlier conclusions regarding the effect of the Chronicle's below-cost pricing on the Examiner's revenue.  Rubinfeld filed a supplemental report that again raised numerous criticisms of Eichmann's analyses.

### C. Defendants' Motion to Exclude Eichmann's Testimony and Motion for Summary Judgment or Summary Adjudication

Over defense opposition, the trial court granted defendants' motion to exclude Eichmann's cost, regression, and yardstick analyses pursuant to *Sargon*, *supra*, 55 Cal.4th 747, then granted defendants' motion for summary judgment.  We summarize the latter ruling here.

---

costs—both fixed and variable—attributable on an average basis to each unit of output.' " (*Id.* at p. 820.)

With regard to the section 17043 (below-cost sales) cause of action, the trial court found that plaintiff failed to show a triable issue as to the element of below-cost sales. In particular, the court found plaintiff had disclaimed reliance on specific transactions (citing to plaintiff's separate statement responses and December 2016 joint case management statement), leaving only Eichmann's excluded cost analysis to support the element. The court also found that plaintiff failed to present evidence supporting a triable issue as to the element of injurious purpose. Finally, the court determined that Eichmann's excluded testimony provided the only evidence of causation and damages, but also indicated that plaintiff need not demonstrate harm for the section 17043 cause of action to survive summary judgment.

With regard to the section 17044 (loss leader sales) cause of action, the trial court explained that although plaintiff had committed itself to trying this action on an aggregate basis, plaintiff made no attempt to aggregate the Chronicle's prices with regard to loss leader sales and instead provided only a few anecdotal examples of such sales. Further, plaintiff presented no evidence that the Chronicle made such unspecified loss leader sales with the requisite intent to harm competition.

As for the section 17045 (secret unearned discounts) cause of action, the trial court determined that, even accepting plaintiff's contention that all of the Chronicle's sales below rate card rates could properly be treated as secret unearned discounts, plaintiff's aggregate proof of harm hinged on Eichmann's regression analysis, which was not only inadmissible but not even directed at secret unearned discounts.

Finally, regarding the UCL cause of action, the trial court determined that, although plaintiff implied it could proceed even if the three UPA claims failed, plaintiff failed to suggest or refer to evidence supporting that claim.

Plaintiff appealed from judgment entered in defendants' favor.

## DISCUSSION

Plaintiff challenges the trial court's grant of summary judgment. The rules governing our review of plaintiff's contentions are well established. A "motion for summary judgment shall be granted if all the papers submitted show that there is no

5

triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A defendant carries the initial burden of showing that a cause of action has no merit by demonstrating that one or more elements of the cause of action cannot be established or a complete defense to it exists. (*Id.*, § 437c, subd. (p)(2).) Once the defendant has met that burden, the burden shifts to the plaintiff to show a triable issue exists. (*Ibid.*) The evidence in favor of the party opposing the motion must be liberally construed, and all doubts concerning the evidence must be resolved in favor of that party. (*Fisherman's Wharf Bay Cruise Corp. v. Superior Court of San Francisco* (2003) 114 Cal.App.4th 309, 320–321.) We review an order granting summary judgment de novo. (*Id.* at p. 320.)

## A. The UPA Cause of Action for Below-Cost Sales (§ 17043)

Section 17043 makes it unlawful "for any person . . . to sell any article or product at less than the cost thereof . . . for the purpose of injuring competitors or destroying competition." " 'Article or product' includes any article, product, commodity, thing of value, service or output of a service trade." (§ 17024.) Violation of this section requires two elements: (1) a below-cost sale (2) undertaken for the purpose of injuring competitors or destroying competition. (*Bay Guardian Co. v. New Times Media LLC* (2010) 187 Cal.App.4th 438, 454 & 456–457.)

Turning to the first element, a fully allocated cost standard is employed for purposes of the UPA. (*Turnbull*, *supra*, 219 Cal.App.3d at pp. 819–820.) Under this standard, "cost" is "a fair allocation of all fixed or variable costs associated with production of the article or product." (*Pan Asia Venture Capital Corp. v. Hearst Corp.* (1999) 74 Cal.App.4th 424, 432 (*Pan Asia*).) "Thus, cost has been described as the initial expense of producing the article together with 'its share of the load of carrying on the business through which it is sold.' " (*Ibid.*) "[T]here are many ways of fully allocating costs, [but] the possibilities are not without limitation. To be legally acceptable, the allocation of indirect or fixed overhead costs to a particular product or service must be reasonably related to the burden such product or service imposes on the overall cost of doing business." (*Turnbull*, *supra*, 219 Cal.App.3d at p. 822.)

6

Plaintiff contends it raised a triable issue of fact in presenting evidence of cost and below-cost sales through its expert, Eichmann, whose cost analysis was wrongly excluded. We examine that evidentiary ruling now.

### 1. *Additional Background*

Before discussing Eichmann's cost analysis, we briefly discuss a 2010 report by John Sillers,[4] then the Chronicle's Director of Finance. Sillers put together an "analysis of costs" to support his view that the Chronicle "needed to exercise greater rate discipline when selling advertisements." By "rate discipline," Sillers meant a rate floor below which the company would not go in a declining market garnering progressively lower rates. Sillers did his analysis by taking various levels of expenses related to "a print product," compared that to an average rate per page the Chronicle was garnering, then determined what the Chronicle needed to charge on average to break even, meaning revenue would cover production and newsprint expenses. One of Sillers's spreadsheets was headed with the words, "Breakeven Pricing." (Bold omitted.) Sillers submitted a sworn declaration and deposition testimony that his analysis had nothing to do with the UPA, with which he was unfamiliar. Sillers explained his analysis was based partially on budget figures as opposed to actual results, and he did not recall his methodology or reasons for some of his decisions. He asserted he did not create or know how he obtained the average prices he used in the analysis, and his analysis was not a template but would require an updated evaluation for addressing subsequent years.

We now turn to plaintiff's expert, Eichmann, who claimed to calculate the Chronicle's "fully allocated cost" for print advertising. Eichmann's methodology for this calculation included five main components. First, he allocated 100 percent of the following seven categories of expenses as direct costs of print advertising: production

---

[4] Sillers's "accounting education" consisted of having a general M.B.A. degree (no focus on accounting) from U.C. Berkeley and working for Deloitte Haskins & Sells for two years. He received a CPA in 1987 but "did not stay active." He worked for the Examiner from 1985 to 2000, then moved to the Chronicle when it was acquired by Hearst Corporation in 2000.

payroll, newsprint handlers payroll, production and newsprint and ink (N&I), N&I handlers payroll, supplements, editorial payroll, and editorial expense. Eichmann testified he did not know what some of these expenses were for and did no independent work to determine how they should be allocated, but instead relied solely on Sillers's analysis to allocate them[5]. Eichmann admitted he did not know Sillers's purpose for his analysis and was unaware of Sillers's testimony that he had never heard of the UPA. Eichmann allocated these categories as he did despite acknowledging that 75 percent of the Chronicle's newspaper pages are editorial, and 25 percent are advertising.

Second, Eichmann amortized a $200 million dollar contract renegotiation expense with the Chronicle's printer over 11.5 years and allocated 100 percent of the amounts as direct costs.

Third, Eichmann treated advertising payroll, advertising, general and administrative (G&A) payroll, G&A benefits, G&A other, postage, occupancy costs, and depreciation as indirect expenses and allocated them using two alternative "attribution percentages."[6]

Fourth, Eichmann deemed $1.2 billion that Hearst Corporation had spent to purchase the Chronicle and fund operations to be a "loan," then calculated the annual costs of servicing that "loan," and allocated these servicing costs as an indirect cost using the aforementioned two attribution percentages.

Finally, Eichmann used historic averages to estimate numerous categories of expenses in 2014 and 2015 for which he was not provided detailed income statements.

---

[5]    Despite his stated reliance on Sillers's analysis, Eichmann's report deviated from Sillers's methodology in some respects. For example, Eichmann's report included an alternative analysis where he treated the editorial payroll and editorial expense categories as indirect rather than direct costs, to accommodate an alternative view that editorial payroll and editorial expense affect both print advertising and circulation revenue.

[6]    These two percentages are the "ROP Paid Ad Percent" that represents the ratio of paid advertising pages to total pages printed in a given year, and the "print revenue as percent of total revenue" that represents the percent of an indirect cost equivalent to the print revenue as percent of total revenue for that year.

In the end, Eichmann opined the Chronicle's fully allocated cost of producing a page of print advertising from 2011 to 2015 ranged from $13,134 to $25,030 "depending on the year, calculation of indirect and direct expenses, and inclusion of costs associated with loan servicing." Eichmann then calculated the average price paid for print advertising in the Chronicle, compared it to the foregoing cost estimate, and concluded that between 2011 and 2015, a majority of the Chronicle's advertising customers paid below cost for a majority of advertising.

As indicated, the trial court granted defendants' motion to exclude Eichmann's cost analysis. The court explained that Eichmann, an economic consultant with no experience allocating costs for a subscription-based newspaper with paid advertising, lacked the "foundational knowledge to conduct a cost analysis" and relied on Sillers's analysis without understanding its foundations or knowing whether Sillers did a UPA cost analysis, which the evidence showed Sillers did not.

### 2. Legal Principles

"Trial judges have a substantial gatekeeping responsibility when it comes to expert testimony." (*People ex rel. Dept. of Transportation v. Dry Canyon Enterprises, LLC* (2012) 211 Cal.App.4th 486, 493.) Under Evidence Code section 801, subdivision (b), a trial court must determine whether the matter relied on is of a type on which an expert may reasonably rely, and "acts as a gatekeeper to exclude speculative or irrelevant expert opinion." (*Sargon*, *supra*, 55 Cal.4th at p. 770.) " '[T]he expert's opinion may not be based "on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors." ' " (*Ibid.*) Additionally, Evidence Code section 802 permits a court to inquire into the expert's reasons for an opinion. (*Sargon,* at p. 771.) It also permits a court to find the expert is precluded by law from using the reasons or matter as a basis for the opinion. (*Ibid.*) "This means that a court may inquire into, not only the type of material on which an expert relies, but also whether that material actually supports the expert's reasoning. 'A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.' " (*Ibid.*) As gatekeeper, the trial court does not choose between or weigh competing expert opinions based on persuasiveness. (*Id.* at

9

p. 772.)  Instead, the gatekeeper must focus on principles and methodology to determine whether the opinion is founded on sound logic, i.e., "whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture."  (*Ibid.*)  The gatekeeper's goal is to ensure an expert employs the same intellectual rigor in the courtroom as an expert in the field.  (*Ibid.*)  These principles apply to evidence submitted in connection with motions for summary judgment and summary adjudication.  (*Sanchez v. Kern Emergency Medical Transportation Corp.* (2017) 8 Cal.App.5th 146, 155 (*Sanchez*).)

We review a ruling excluding expert testimony for abuse of discretion.[7]  (*Sargon*, *supra*, 55 Cal.4th at p. 773; *Property California SCJLW One Corp. v. Leamy* (2018) 25 Cal.App.5th 1155, 1162 (*Property California*).)  An abuse of discretion is one that no reasonable person could agree with because it is so irrational or arbitrary.  (*Sargon*, at p. 773.)  The standard is a deferential one, and an appellate court may not substitute its discretion for that of the trial court, even if it disagrees.  (*Avant! Corp. v. Superior Court*

---

[7]    With regard to the standard of review, plaintiff seems to acknowledge that the standard of review for exclusion of expert evidence is abuse of discretion, and seems to argue only that a failure to liberally construe expert testimony in opposition to a motion for summary judgment is an abuse of discretion.  That said, plaintiff vaguely suggests de novo review is appropriate, citing to *Kinda v. Carpenter* (2016) 247 Cal.App.4th 1268 (*Kinda*).  *Kinda* is not on point.  *Kinda* supports that when an in limine motion is used to preclude an entire cause of action at trial (i.e., as a dispositive motion) then the trial court must apply the restrictive standard of a nonsuit, i.e., it may not grant a nonsuit if the evidence would support a jury verdict in the opposing party's favor.  (*Kinda*, at pp. 1285–1286.)  Appellate courts then review such motions de novo, interpreting the evidence most favorably to a plaintiff's case and resolving all presumptions, inferences, and doubts in favor of the plaintiff.  (*Id.* at pp. 1279–1280.)  This case, however, does not involve an in limine motion being used as a dispositive motion; this case involves a summary judgment motion—a traditional dispositive motion—where the aforementioned standards already apply.  *Kinda* does not support that evidentiary rulings brought alongside summary judgment motions are reviewed de novo.  Cases support application of the abuse of discretion standard to rulings excluding expert evidence from the summary judgment record.  (See *Sargon*, *supra*, 55 Cal.4th at p. 773; *Property California, supra*, 25 Cal.App.5th at p. 1162; *Duarte v. Pacific Specialty Ins. Co.* (2017) 13 Cal.App.5th 45, 52; *Sanchez*, *supra*, 8 Cal.App.5th at p. 154.)

10

(2000) 79 Cal.App.4th 876, 881–882.)  The appellant has the burden on appeal to show an abuse of discretion.  (*Property California*, at p. 1163.)

### 3. *Analysis*

In this case, there appears no basis for concluding the trial court abused its discretion in excluding Eichmann's cost analysis.  That analysis suffered from a clear foundational problem.  Specifically, Eichmann's methodology included allocating 100 percent of seven categories of expenses as direct costs of print advertising.  While Eichmann had credentials as an economic consultant, he acknowledged he had no understanding of several of the cost categories and did no independent work to determine how those categories should be allocated.  Instead, he relied *solely* on Sillers's 2010 analysis to allocate these costs, without knowing the purpose of Sillers's analysis or having any awareness that Sillers testified his analysis had nothing to do with the UPA.  The evidence additionally showed that Sillers himself did not recall the methodology he used or the reasons for some of his decisions.

Ultimately, Eichmann's uninformed reliance on Sillers's analysis is not the mark of an opinion rooted in sound logic.  (*Sargon*, *supra*, 55 Cal.4th at p. 772; *Taylor v. Trimble* (2017) 13 Cal.App.5th 934, 945, fn. 15 ["An expert opinion that does not contain 'a reasoned explanation illuminating why the facts have convinced the expert' need not be relied on"].)  And because the record does not reflect the foundations of Sillers's analysis, it is unclear whether his analysis is "of a type that reasonably may be relied upon by an expert in forming an opinion" about fully allocated costs (Evid. Code, § 801, subd. (b)) or whether it even supports Eichmann's opinion about fully allocated costs.  (*Sargon*, at p. 771.)

Plaintiffs' insistence that Sillers performed a fully allocated cost analysis under the UPA is unsupported.  As the trial court noted in its statement of decision, the evidence in the record militates against that conclusion.  Specifically, a relevant part of Sillers's report is headed with the words "Breakeven Pricing."  (Bold omitted.)  Sillers himself said he did an analysis of costs, but he also said he had never heard of the UPA and did not do a UPA cost analysis.  Rather, he determined what the Chronicle needed to charge

11

on average to "break-even," meaning print product would "cover production and newsprint expenses." Defense expert Rubinfeld offered reasons why Sillers's analysis was not a UPA cost analysis, but instead an analysis to determine how much revenue the Chronicle would need to generate per page of print advertising to break even (i.e., generate enough print advertising revenue to arrive at zero profit before income tax), assuming all its other revenue sources stayed the same. (See, e.g., *Sanchez*, *supra*, 8 Cal.App.5th at p. 162 [plaintiff's expert opinion properly excluded where material accompanying defendant's expert declaration showed plaintiff's expert based opinions on unfounded assumptions, or on speculative or conjectural factors].) Although Eichmann stated his opinion that Sillers was doing a "cost analysis," Eichmann's statement is conclusory and had no evidentiary value. (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117.)

Plaintiff next contends that "allocating the full amount of several categories of costs to advertising, as Sillers did, accorded with the practice in the newspaper industry generally, and at the Chronicle specifically, of burdening the advertising revenue with direct and indirect expenses of producing the newspaper." This argument fails to persuade. The plain language of *Sargon* dictates that a trial court exercise its gatekeeping function by considering the matter or information an expert actually relied on in reaching an opinion. (*Sargon*, *supra*, 55 Cal.4th at p. 772.) Here, there was no evidence that Eichmann knew about—much less relied on—the information plaintiff relies on making this argument to justify his reliance on Sillers's analysis or to explain his own allocation decisions.[8]

In arguing that Eichmann's model satisfied the minimal quantum of evidence necessary to put the issue of cost before a jury, plaintiff relies on the *Pan Asia* decision,

---

[8]     Plaintiff relied in part on generalized testimony about advertising pricing from its newspaper industry expert, James Hopson, in making this claim. We note here that there is no evidence that Hopson reviewed the Chronicle's costs specifically, or that he performed his own cost analysis regarding print advertising at the Chronicle. Nor did Eichmann claim that he relied on Hopson's testimony in forming his opinion on cost allocations.

12

which involved a lawsuit between two San Francisco newspapers, the Examiner and the Independent. (*Pan Asia*, *supra*, 74 Cal.App.4th at p. 427.) There, the Independent alleged that the Examiner bid below cost in violation of section 17043 to win an annual contract from the City and County of San Francisco to publish public notices required by state and municipal law. (*Pan Asia,* at p. 427.) The Independent's expert determined cost by recognizing the existence of two products produced by Examiner—physical newspapers and advertising space—and allocating costs between them (called a "revenue allocation" model). (*Id.* at pp. 428–429.) Taking a different approach, the Examiner's expert allocated costs "according to the amount of space dedicated to advertising, as opposed to news or editorial coverage" (called a "physical unit allocation" model). (*Id.* at pp. 429–430.) Mid-trial, the court excluded the Examiner's expert, believing that his model was not a fully allocated cost model and was inappropriate in that case, calling it "irrational." (*Id.* at p. 430.) The *Pan Asia* court concluded this was error. Observing that the determination of cost is generally an issue of fact, *Pan Asia* reasoned that while one could pick out flaws in the models of both parties' experts, "both approaches [were] sufficiently reasonable that both ought to have been put before the jury" and "[n]either [was] entitled to prevail as a matter of law." (*Id.* at pp. 432, 437.)

*Pan Asia* predates *Sargon* by over a decade. Because *Pan Asia* did not consider the issue of admissibility of expert testimony under the gatekeeping principles set out in *Sargon*, that case is not particularly useful in analyzing the situation here. As explained, the trial court properly excluded Eichmann's cost analysis as lacking in foundation under the principles set out in *Sargon*, and not because it believed that Eichmann's model (which plaintiff claims is a "variation on both of the cost models in *Pan Asia*") was unworkable or inappropriate in this case.

Relying on *Western Union Financial Services, Inc. v. First Data Corp.* (1993) 20 Cal.App.4th 1530 (*Western Union*), plaintiff contends it was reasonable for Eichmann to rely on Sillers's analysis. We are not convinced. *Western Union* also predates *Sargon* and did not assess the admissibility of the subject expert evidence under *Sargon*'s gatekeeping principles. More to the point, plaintiff merely relies on a reference in the

13

decision's statement of facts that Western Union's expert determined First Data's costs by relying only on a document created by a nonmanagement First Data employee. (*Western Union*, at pp. 1533–1534.) Because the propriety of that reliance was not examined on appeal, the reference is clearly dictum with no persuasive value.

Finally, plaintiff contends that even if Eichmann's reliance on Sillers's analysis was improper, exclusion of Eichmann's *entire* cost analysis was erroneous. In this regard, plaintiff argues the court should have looked at Eichmann's assessment of the Chronicle's indirect costs to support a cost figure and at evidence in the record concerning specific transactions, such as a specific transaction in 2013. Had the court done so, plaintiff claims, it would have found that the Chronicle sold below that indirect cost figure. Plaintiff also suggests that, had the court liberally construed the expert testimony, the court could have, on its own, ascertained a new aggregate cost model that would have shown below-cost sales on an aggregate basis.

Because plaintiff posits these claims for the first time on appeal, we decline to consider them. (*Expansion Pointe Properties Limited Partnership v. Procopio, Cory, Hargreaves & Savitch, LLP* (2007) 152 Cal.App.4th 42, 54–55 (*Expansion Pointe Properties*) [" 'Generally, the rules relating to the scope of appellate review apply to appellate review of summary judgments. . . . Thus, *possible theories that were not fully developed or factually presented* to the trial court cannot create a 'triable issue' on appeal' "].) Further, to the extent plaintiff is trying to rely on specific transactions to prove its claims, we observe the trial court correctly found—based on the previously mentioned December 2016 joint case management statement and plaintiff's separate statement responses—that plaintiff disclaimed reliance on specific transactions to prove the occurrence of below-cost sales. Considering the entirety of the 2016 joint case management statement[9] (not just the select portions plaintiff quotes) and plaintiff's

---

[9] As previously indicated, in the December 2016 joint case management statement, plaintiff asserted Eichmann would offer expert testimony about "costs, causation, and damages." Plaintiff then laid out Eichmann's methodology as follows: "*without focusing on any particular advertisers or sampling of advertisers*, Mr. Eichmann analyzed all of

14

separate statement response (discussed more below) that it would "not be proving its below-cost claim on a transaction-by-transaction basis," we reject plaintiff's assertion that its disclaimer applied only to proof of damages.

We are not persuaded by plaintiff's contention that the trial court was required to consider its evidence of specific transactions because defendants did not object. In its response to defendant's separate statement, plaintiff did not identify the particular below-cost sales that it now claims its section 17043 claim is based on, and instead unambiguously represented: "*Plaintiff will not be proving its below-cost claim on a transaction-by-transaction basis*, but has identified numerous examples of specific below-cost sales in support of its arguments." (Italics added.) Also, defendants did in fact object in their reply papers and orally at the hearing to plaintiff's reliance on specific transactions in opposing the motion. Plaintiff contends that, in any event, the trial court should not have excluded the evidence, citing to a portion of *People ex rel. City of Dana*

the transactions for all of the Chronicle's advertisers and determined that the Chronicle was, indeed, pricing its FRROP advertising well below cost. Taking the next step in his analysis, Mr. Eichmann then demonstrated, with scientific certainty, that the Chronicle's below-cost pricing caused economic injury to the Examiner. . . . Mr. Eichmann calculated that the Examiner has suffered approximately $17 million in lost profits due to the Chronicle's below-cost pricing. [¶] . . . *It is worth emphasizing* again that Mr. Eichmann's *analyses are based on the complete transactional records* of both the *Chronicle* and the *Examiner. He has not relied on any surveys of any particular advertisers or on any 'statistical sampling' of the data to reach his conclusions.* Instead, he has considered every relevant transaction involving FRROP advertising at both the Chronicle and the Examiner. . . . *In short, Mr. Eichmann's methodology does not rely on any particular advertiser or group of advertisers and, thus, any individualized advertiser evidence or testimony is irrelevant to his analysis. As a result, to the extent the defendants were once worried that they would need to take the depositions of 'hundreds and hundreds' of advertisers, depending upon whether the plaintiff[']s expert relied on a 'nonstatistical' model, that worry is now gone because no advertiser depositions are necessary or even relevant in light of Mr. Eichmann's statistical analysis.*" (Italics added.)

In rejecting plaintiff's attempt to prove the occurrence of below-costs sales by relying on proof of specific transactions, the trial court noted plaintiff's foregoing case management statement had a decisive impact on defendants' discovery plans, as it resulted in defendants not taking advertiser depositions.

15

*Point v. Holistic Health* (2013) 213 Cal.App.4th 1016 indicating it would be error to exclude evidence from a summary judgment record based on discovery enforcement provisions in Code of Civil Procedure section 2023.030, which had specific procedural requirements that the proponent of exclusion did not comply with. (*People ex rel. City of Dana Point v. Holistic Health*, at pp. 1029–1032.) Here, in contrast, there was no known discovery violation that implicated Code of Civil Procedure section 2023.030.

For the reasons stated, we conclude the trial court did not abuse its discretion in excluding Eichmann's entire cost analysis.

Likewise, we find no error with the grant of summary judgment on this cause of action. Eichmann's cost analysis was plaintiff's sole evidence of cost, without which it could not prove sales below cost. It was also plaintiff's only evidence concerning the *occurrence of below-cost sales*, given plaintiff's representations that it was not going to be proving its below-cost claim on a transaction-by-transaction basis. Once Eichmann's cost analysis was excluded, defendants carried their burden of showing no triable issue as to the occurrence of below-cost sales. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853 (*Aguilar*).)[10]

We end our analysis of this cause of action here. (Code Civ. Proc., § 437c, subd. (p)(2) ["A defendant . . . has met his or her burden of showing that a cause of action has no merit if the party has shown that one or more elements of the cause of action . . .

---

[10] Despite identifying Sillers's analysis as evidence of the Chronicle's fully allocated costs in a separate statement response, plaintiff does not argue in his appellate briefs that Sillers's analysis independently supports the element of below-cost sales. (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 (*Paterno*) ["An appellate court is not required to examine undeveloped claims, nor to make arguments for parties"].) At oral argument, plaintiff seemed to suggest Sillers's analysis was evidence of the Chronicle's fully allocated costs. We disregard this because it was not timely raised (*Sunset Drive Corp. v. City of Redlands* (1999) 73 Cal.App.4th 215, 226), and in any event, plaintiff offered no competent evidence from Eichmann or any other expert countering Sillers's representation that his analysis was not a UPA cost analysis. Finally, we note Sillers's report is from 2010, and his declaration cuts against any conclusion that his analysis represents costs beyond that year.

16

cannot be established"].)  We express no opinion concerning the trial court's ruling as to the injurious purpose element of this cause of action.  Briefly, however, we address plaintiff's claim the court "incorrectly granted summary judgment on [its] claim for damages" which contains the argument that the court improperly excluded Eichmann's regression and yardstick analyses.  Suffice it to say the court did not rely on lack of evidence concerning causation and damages to support the grant of summary judgment as to the section 17043 cause of action.  The court said Eichmann's evidence regarding causation and damages should be excluded, but it also said harm to plaintiff is not necessary to establish liability under section 17043 so plaintiff need not make any showing on these elements to survive summary judgment.  We thus see no need to address the propriety of the exclusion of Eichmann's regression and yardstick analyses.

## B.  The UPA Cause of Action for Loss Leader Sales (§ 17044)

Section 17044 of the UPA makes it unlawful for any person engaged in business to sell or use any article or product as a "loss leader," which is defined in section 17030 as "any article or product *sold at less than cost*:  [¶] (a) Where the purpose is to induce, promote or encourage the purchase of other merchandise; or [¶] (b) Where the effect is a tendency or capacity to mislead or deceive purchasers or prospective purchasers; or [¶] (c) Where the effect is to divert trade from or otherwise injure competitors."  (Italics added.)  As above, the occurrence of a below-cost sale is an element of this cause of action.  (See CACI No. 3302.)

Defendants carried their burden on summary judgment by showing plaintiff failed to identify the loss leader sales this claim was based on.  (*Aguilar*, *supra*, 25 Cal.4th at p. 853.)  In its separate statement, defendants set out as undisputed facts that (i) plaintiff did not identify any below-cost sales this claim was based on, and (ii) plaintiff's experts offered no opinion about loss leaders.  The burden thus shifted to plaintiff to identify the claimed loss leader sales.  But in its response to defendants' separate statement, plaintiff indicated that it "[p]artially disputed" its supposed failure to identify any particular sales, representing to defendants and the trial court:  "*Plaintiff will not be proving its loss leader claim on a transaction-by-transaction basis*, but has identified several examples of

17

specific loss leader sales in support of its arguments." (Italics added, bold omitted.) Moreover, in disputing defendants' factual assertion that plaintiff's experts offered no opinion about loss leaders, plaintiff asserted that Eichmann's opinions were relevant to damages for the loss leader claim, and it cited to examples of specific transactions to substantiate its loss leader claim. Put simply, plaintiff indicated that the only expert opinion relevant to the section 17044 claim was Eichmann's damages analysis, yet at the same time plaintiff represented that the section 17044 claim was not based on specific transactions, leaving it entirely unclear what this claim was based on.

Plaintiff's current citation to examples of specific transactions to support its loss leader claim is unavailing. As indicated, plaintiff's position in the trial court was that it would not be proving its loss leader claim on a transaction-by-transaction basis. Consequently, we will hold plaintiff to its word and deem the argument waived. (*Expansion Pointe Properties*, *supra*, 152 Cal.App.4th at pp. 54–55.) Although plaintiff argues all it meant by its separate statement response was it would not be identifying every instance of a loss leader, this is belied by the plain language of its response.

For the reasons stated, we affirm the grant of summary judgment on this cause of action.

## C. The UPA Cause of Action for Secret Unearned Discounts (§ 17045)

Section 17045 of the UPA provides: "The *secret* payment or allowance of rebates . . . or *unearned discounts*, whether in the form of money or otherwise, or secretly extending to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions, *to the injury of a competitor* and where such payment or allowance tends to destroy competition, is unlawful." (Italics added.) "By its terms, section 17045 requires the plaintiff to prove not only injury to a competitor, but, *in addition*, a tendency 'to destroy competition.' " (*ABC Internat. Traders, Inc. v. Matsushita Electric Corp.* (1997) 14 Cal.4th 1247, 1262.)

The trial court granted summary judgment on this cause of action, reasoning plaintiff's aggregate proof of harm hinged on Eichmann's regression analysis, which was

18

inadmissible and, in any event, not directed at secret unearned discounts.[11]  On appeal, plaintiff does not show error.  Plaintiff does not address the trial court's finding that the regression analysis was "no[t] directed at secret unearned discounts."  Nor does plaintiff argue that the regression analysis, if admitted, would have supported the injury element of the section 17045 claim.  Accordingly, we will not review the exclusion of the regression analysis here.  (*Paterno*, *supra*, 74 Cal.App.4th at p. 106.)

Plaintiff points to examples of specific transactions that allegedly involved secret unearned discounts and claims these harmed the Examiner and tended to destroy competition.  As stated, however, plaintiff disclaimed any intent to prove causation and damages via evidence of specific transactions.

Also for the first time in its reply brief, plaintiff argues Eichmann's yardstick analysis supports the injury element of the section 17045 claim.  We reject this for the following reasons.  Not only did plaintiff's failure to raise the argument in its opening brief result in its waiver (*Telish v. State Personnel Bd.* (2015) 234 Cal.App.4th 1479, 1487, fn. 4), but the specific argument in its reply brief contains no citations to the record (*Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979 (*Kim*) and is completely undeveloped.  (*Paterno*, *supra*, 74 Cal.App.4th at p. 106.)  Plaintiff cites no evidence in the record showing the relevance of Eichmann's yardstick analysis to the section 17045 claim and indeed, on its face, Eichmann's analysis says nothing specific about secret unearned discounts.

For the reasons stated, we affirm the grant of summary judgment on this cause of action.

### D.  The UCL Cause of Action

With regard to the last cause of action for violation of section 17200 of the UCL, plaintiff states here—as it did below—that this claim was based on the conduct underlying the UPA causes of action.  Plaintiff contends that if summary judgment is

---

[11]     Plaintiff appears to concede that injury is a necessary element under section 17045.

reversed on any of the UPA claims, it should be reversed on the UCL claim as well, while simultaneously asserting that the UCL claim should not rise or fall with the UPA claims because the former is broader than the latter.  In so asserting, however, plaintiff cites no evidence in the record supporting the UCL cause of action, and espouses no theory for how it might proceed in the absence of a valid UPA claim.  We will neither speculate nor make arguments for plaintiff (*Paterno*, *supra*, 74 Cal.App.4th at p. 106) and will instead affirm the grant of summary judgment on this cause of action.

## DISPOSITION

The judgment is affirmed.  Defendants are entitled to recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

_____
Fujisaki, J.

WE CONCUR:


_____
Siggins, P. J.


_____
Petrou, J.


A152930

21

San Francisco Print Media v. Hearst Corporation et al. (A152930)

Trial court:          City & County of San Francisco

Trial Judges:         Hon. Curtis E. A. Karnow

Attorneys:            Horvitz & Levy, Jeremy B. Rosen, Joshua C. McDaniel; Jenner &
                      Block, Rick Richmond, Jeffrey A. Atteberry for Plaintiff and
                      Appellant.

                      Greenberg Traurig, Karin L. Bohmholdt, Alan Mansfield (pro hac
                      vice), Stephen L. Saxl (pro hac vice) for Defendant and Respondent.

22