Filed 1/19/22  Maximo v. Threatt CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| GUADALUPE MAXIMO,<br><br>　　　Plaintiff and Appellant,<br><br>　　v.<br><br>RYAN THREATT,<br><br>　　　Defendant and Respondent. | B301735<br><br>(Los Angeles County<br>Super. Ct. No. BC654184) |

APPEAL from a judgment of the Superior Court of Los Angeles County, James A. Kaddo, Judge.  Affirmed.

Law Office of Patrick T. Santos and Patrick T. Santos for Plaintiff and Appellant.

Richardson, Fair and Cohen and Kimberley L. Maxwell for Defendant and Respondent.

_____

Guadalupe Maximo appeals from a judgment entered after a jury awarded her $22,620 in damages for personal injuries suffered in a 2016 automobile collision with Ryan Threatt. Because the award did not exceed Threatt's pretrial offer to settle the case under Code of Civil Procedure section 998,[1] the trial court entered judgment in favor of Threatt after offsetting Maximo's recovery with Threatt's litigation costs.

On appeal, Maximo contends the trial court abused its discretion in allowing Threatt's medical and biomechanics experts to testify outside their areas of expertise, beyond the scope of their deposition testimony, and in violation of the court's pretrial orders. Maximo also asserts the trial court abused its discretion in denying her motions in limine to exclude evidence of medical liens placed by her doctors on her recovery and her attorneys' referral of her to specific doctors. In addition, she argues the court erred in failing to instruct the jury on the "eggshell plaintiff" theory. Finally, Maximo argues the trial court erred in awarding an offset to Threatt for his litigation costs under section 998 without requiring Threatt to file a motion for offsets. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.   *The Accident*

On the evening of February 2, 2016, Maximo drove her 2015 Kia Optima eastbound on Hyde Park Boulevard in Los Angeles. Threatt was driving his 2000 Honda Accord behind her.

---

[1]   All statutory references are to the Code of Civil Procedure unless otherwise indicated.

When Maximo's car reached the intersection of Hyde Park Boulevard and Chester Avenue, she stopped at a stop sign. Threatt failed to stop, and his car struck the back of Maximo's car. Threatt estimated he was traveling approximately "four to seven miles per hour" at the time of the accident. However, his damage reconstruction expert opined at trial that Threatt was traveling 16 to 19 miles per hour. According to Maximo, the collision pushed her car "about 10 to 11 feet." Maximo's car suffered damage to the rear bumper, the passenger side exhaust pipe, and the plastic undercarriage for the spare tire. The accident damaged the driver-side front headlamp, the hood, and the front bumper of Threatt's car.[2] Threatt spent approximately $400 to repair his car.[3]

Neither the police nor paramedics were summoned to the scene. Maximo and Threatt exchanged contact information, and they drove home in their respective cars.

B.      *Maximo's Complaint, Pretrial Discovery, and Pretrial Motions*

In March 2017 Maximo filed a complaint for personal injury and property damage, alleging Threatt was negligent when his car struck hers, causing her to sustain personal injuries from the accident. She sought medical expenses, property damage, loss of income, and pain and suffering. Threatt later

---

[2]      Photographs of the cars taken by Threatt after the accident were admitted at trial.

[3]      Maximo did not introduce evidence of the cost to repair her car.

conceded liability but disputed that Maximo's claimed injuries were caused by the accident.

Maximo designated her treating doctors, Dr. Harry Brooks and Dr. Babak Samimi, as expert witnesses. Threatt designated three experts: Philip Wang, an accident reconstruction expert; Dr. Ronald Kvitne, an orthopedic surgeon; and Kimberly Balogh, a biomechanical engineer. Each party deposed the other's experts before trial.

In April 2018, several months before trial, Threatt served Maximo with a section 998 offer to settle the case for $35,001, but Maximo rejected the offer. Maximo countered with a section 998 offer to settle the case for $69,999, which Threatt rejected.

Maximo filed 10 motions in limine, including, as relevant on appeal, to exclude evidence of (1) Maximo's attorneys' referral of Maximo to specific doctors; (2) Maximo's doctors' placing of medical liens on her recovery in the lawsuit; and (3) medical payments to Maximo from collateral sources, including medical insurance reimbursement. Maximo also sought to preclude Balogh from providing opinions at trial on "medical causation" or "injury causation." The trial court granted Maximo's motion to exclude any reference to payments from collateral sources but denied her other motions. The court clarified with respect to Maximo's motion to preclude Balogh from offering opinions on medical or injury causation that Balogh could "testify that, based on the force of the impact and the position of the passenger or driver inside of that vehicle, [whether] the impact caused the injuries complained of."

4

C.    *The Evidence at Trial*

    1.    *Maximo's case*

Maximo testified that when she got home after the accident, her "whole body [was] in shock and sore." She took acetaminophen and wrapped her left hand in an elastic bandage to ease the pain. Maximo woke up feeling sore the next day, but she went to work. After work, she visited an urgent care facility, complaining of pain in her neck, back, right knee, right ankle, left hand, left thumb, and right wrist. The urgent care records disclosed she had a "contusion" on her right knee. However, Maximo did not know how she sustained the contusion and could not recall whether any part of her body struck any part of the car's interior at the time of the impact. The urgent care doctor advised Maximo to take a muscle relaxer.

Maximo's attorney referred her to Dr. Brooks, an orthopedic doctor. Dr. Brooks testified he examined Maximo approximately one week after the accident. He observed Maximo's right knee was swollen with restricted motion and tenderness on the inside medial joint line, but it was not bruised. Dr. Brooks also noted Maximo had restricted motion in her neck and lower back, pain in her right wrist, and tenderness in her left thumb. Dr. Brooks ordered X-rays and an MRI and prescribed Maximo a knee brace and physical therapy. Maximo did not disclose any prior injuries or conditions affecting her knee. Maximo also did not tell Dr. Brooks that in 2013 she was in a rear-end car accident, in which she sustained a minor injury to her right knee. She did not seek medical treatment after the 2013 accident, and the pain in her knee resolved on its own about a month after the accident.

5

According to Dr. Brooks, the MRI revealed Maximo had patella friction syndrome, a condition causing friction between the knee cap and femur, as well as an "increased signal" on her right knee showing a collection of fat behind the tendon and below the knee cap. The increased signal resulted from inflammation due to her injury. The MRI also showed patella tilt, a malalignment of the knee cap that can cause friction or rubbing, and a condition called chondromalacia. Dr. Brooks opined Maximo's "symptoms were all directly related to the effects of the accident." When asked whether the accident was the only cause of Maximo's condition, Dr. Brooks responded, "Absolutely."

After Maximo attended physical therapy but continued to suffer pain, Dr. Brooks administered two cortisone anti-inflammatory injections to Maximo's right knee, temporarily easing her pain. In November of 2016, however, based on Maximo's ongoing pain, Dr. Brooks recommended she undergo surgery on her right knee. Dr. Brooks opined that based on the fact Maximo had no symptoms before the accident, "the need for the surgery on her right knee is directly due to the effect of the accident of February 2, 2016."

Maximo's attorney recommended that Maximo see Dr. Samimi, an orthopedic surgeon, who examined Maximo in March 2017. Dr. Samimi observed the same conditions in Maximo's knee that Dr. Brooks found in 2016. Dr. Samimi noted the MRI showed swelling in the front of her knee just below the patella. He also determined Maximo had chondromalacia, which is damage to the cartilage in the knee cap. Dr. Samimi opined Maximo's patella tilt had been present since birth. The chondromalacia "could have been there for . . . months up to a

year or two years, but I wouldn't expect it to be there for four, five years. . . ." The chondromalacia would have caused the majority of Maximo's pain. Dr. Samimi testified to a degree of medical certainty and probability that the 2016 car accident caused Maximo's knee injury, necessitating the 2017 surgery. Maximo did not tell Dr. Samimi about the 2013 car accident.

In November 2017 Dr. Samimi operated on Maximo's knee. The surgery addressed the problems resulting from chondromalacia and the patella tilt. During the surgery, Dr. Samimi also "cleaned up and released th[e] tissue" in the inflamed medial synovial plica, which could have resulted from the injury or "for no reason."

Maximo conceded she did not miss any work following the accident until her knee surgery, at which time she missed six weeks of work. All of Maximo's physical complaints, other than her right knee pain, resolved within a month after the accident. Maximo maintained her lifestyle from the spring of 2016 (after receiving physical therapy and cortisone injections) until the surgery in November 2017. She had an active social life, including dancing and vacations during which she did not wear a knee brace.

When Dr. Brooks was asked in cross-examination to explain "the biomechanics [of] how Ms. Maximo's body moved to cause this injury that you say she sustained in the rear-end accident," Dr. Brooks responded that Maximo "first went backward[] and then she went forward[] and then backward[] again." Dr. Brooks believed Maximo hit her knee inside of the interior of the car during this movement. He added that Maximo's injuries also resulted "probably [from] a forceful

7

contraction of the quadriceps muscle because she was putting her foot on the brake."

Dr. Samimi similarly opined, when asked how Maximo's body would have moved in the car, that in a rear-end collision, the person's body moves backward into the seat, then "it's going to ricochet forward into the front of the car." Further, depending on how close the person is to the steering wheel and the dashboard, "with respect to the knee injur[ies] usually I will see either the front of the knee impacting against the dashboard or the knee being held firmly against the brake pedal, and since it's in a flexed position, that contracture of the patella into the femur causes an impaction or a compressed force there." Dr. Samimi added that although he did not have evidence that Maximo's knee hit the dashboard or that she firmly pressed her knee (or foot) against the brake pedal, he based his opinion that one of these things happened on his expertise in orthopedics and evaluation of hundreds of patients in car accidents. He described his experience with injuries from accidents as "biomechanical training" in that he would have to analyze the "biomechanics of [the] injury."

Doctors Brooks and Samimi described the medical bills for Maximo's treatment, including medical tests, physical therapy, a knee brace, and surgery. Both doctors placed medical liens on Maximo's recovery. When asked about the medical lien he had placed on Maximo's recovery, Dr. Brooks explained he provided treatment to Maximo based on the lien, but Maximo would be responsible for the bills regardless of the outcome of the case.

8

### 2. *Threatt's case*

Balogh was a biomechanical engineer, which she described as "an engineer that applies math and physics to the human body utilizing forces of external and internal to biological systems, in our case, the human body and the effects of those forces produced." She opined that when a vehicle is hit from behind, a forward force on the front vehicle is "very similar to being pushed back into the seat." The occupant would go back as the vehicle goes forward, and the head restraint "cushions a lot of energy that was received from that initial impact." Given the impact, it is "acceptable" that Maximo would have suffered the neck, lower back, and middle back injuries she initially reported. However, Balogh opined there were no factors that would have caused Maximo to "come forward into the frontal panel of any form, meaning the steering wheel or the knee bolster or the dashboard."[4] Further, the three-point restraint system would have stopped her from going forward. Balogh added that if Maximo's knee were to hit the knee bolster, she would expect to see bruising of the bone or skin associated with the bone, but Dr. Brooks did not diagnose Maximo with a contusion.[5]

---

[4] Balogh explained a "knee bolster" is the pad underneath the steering wheel and steering column, "which is centered along the midline of the human body and the pelvis."

[5] Balogh acknowledged that Maximo's records showed a contusion (from her urgent care visit), but Balogh noted that "when there's someone that goes in and claims . . . a soreness of some sort, sometimes they will just diagnose a sprain or strain or a contusion."

Balogh opined the trauma from the rear-end collision would not have caused chondromalacia, which could result from an impact, because there was no impact to Maximo's knee, and "it's more likely that it would be associated with some congenital disorders also diagnosed," including patella tilt and a medial synovial plica. Balogh opined the patella tilt "increases your chances of friction there which would, in turn, create a chondromalacia, especially if you have imbalances on your muscles." As to patella tendon friction syndrome, "[f]riction is indicative of having a rougher surface to rub against, and then a syndrome is often associated with overuse." Further, direct trauma was not necessary to cause the condition. Balogh disagreed with Dr. Samimi's opinions on the biomechanics of the accident, explaining that Maximo would have maintained the position of her foot as she was pushed back into the cushion of the seat, causing her knee to extend "a little but, not fully," taking pressure off the patella. Balogh also disagreed with Dr. Samimi's opinion that Maximo would have ricocheted back into the seat, then forward. Balogh opined that, based on the science of kinematics and biomechanics, Maximo would have been pushed back into the seat and returned to a normal resting position.

Dr. Kvitne, an orthopedic surgeon, similarly opined that the movement of Maximo's body in a rear-end collision would not have caused an injury to Maximo's knee requiring surgery because the occupant of the first vehicle in a rear-end collision would move backward, and it would be "biomechanically physically impossible" for Maximo's knee to hit the dashboard. Further, if Maximo's knee sustained direct trauma from the accident as she had claimed, her injuries would have been

10

different and more severe. He noted Maximo drove away from the accident scene, drove herself to urgent care the next day, and did not miss any time from work, showing the injury was at most a soft tissue injury that would not require surgery. Further, the MRI showed a chronic knee cap alignment issue that Maximo had "on and off for years." Dr. Kvitne opined the surgery was not necessitated by the accident, but rather, would have corrected a "longstanding preexisting knee cap malalignment problem that would give [her] symptoms of pain and swelling from time to time depending on [her] activity level." Finally, Dr. Kvitne critiqued the medical expenses Maximo incurred, opining many of the charges for Maximo's treatment were unreasonable.

On July 16, 2021 the jury returned a special verdict in favor of Maximo for $22,620, including $20,220 for past medical damages and $2,400 for pain and suffering.

D.    *Judgment and Appeal*

On August 9, 2019 Threatt served a memorandum of costs seeking $52,843.06 and a proposed judgment that set forth the jury's award of $22,620 in general and special damages with a blank line for the amount of an offset for Threatt's costs. Maximo did not file an objection to the proposed judgment, nor did she move to strike or tax Threatt's claimed costs. On September 3, 2019 the court entered the judgment.[6]

---

[6]    The judgment provided, "Pursuant to CCP section 998, Defendant, Ryan Threatt is entitled to costs from Plaintiff, Guadalupe Maximo, the sum of $52,843.06 in costs." (Capitalization omitted.) Although the judgment contains a blank for the amount of an offset, it is undisputed that the jury's award of $22,620 for Maximo

11

Maximo timely appealed.

## DISCUSSION

A.    *The Trial Court Did Not Commit Prejudicial Error in Admitting Threatt's Expert Evidence*

1.    *Standard of review*

We review the trial court's rulings on the admission of evidence for an abuse of discretion.  (*People v. Trujeque* (2015) 61 Cal.4th 227, 278; *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 (*Sargon*).)  A ruling constitutes an abuse of discretion only if it is "'so irrational or arbitrary that no reasonable person could agree with it.'" (*Sargon*, at p. 773; accord, *Sanchez v. Kern Emergency Medical Transportation Corp.* (2017) 8 Cal.App.5th 146, 154.)

Even if a trial court abuses its discretion in admitting evidence, the judgment may only be reversed if the error was prejudicial.  (*ABM Industries Overtime Cases* (2017) 19 Cal.App.5th 277, 293; *Grail Semiconductor, Inc. v. Mitsubishi Electric & Electronics USA, Inc.* (2014) 225 Cal.App.4th 786, 799 (*Grail Semiconductor*); see Cal. Const., art. VI, § 13 ["No judgment shall be set aside . . . on the ground . . . of the improper admission or rejection of evidence, . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."].)

---

was offset by the cost award to Threatt, resulting in a net judgment in favor of Threatt.

"'In civil cases, a miscarriage of justice should be declared only when the reviewing court, after an examination of the entire cause, including the evidence, is of the opinion that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'" (*Grail Semiconductor, supra*, 225 Cal.App.4th at p. 799; accord, *ABM Industries Overtime Cases, supra*, 19 Cal.App.5th at p. 293.) The appellant has the burden of demonstrating the error was prejudicial. (*Kim v. The True Church Members of Holy Hill Community Church* (2015) 236 Cal.App.4th 1435, 1444; *Grail Semiconductor*, at p. 799.)

2. *The trial court did not abuse its discretion in admitting Dr. Kvitne's testimony*

a. *Dr. Kvitne was qualified to testify about whether the accident caused Maximo's injury*

Maximo contends the trial court abused its discretion in overruling her attorney's objection that Dr. Kvitne provided expert opinion testimony on biomechanics, which was beyond his professional qualifications. In explaining why the accident did not cause Maximo's knee injury, Dr. Kvitne testified, "The occupant . . . in the vehicle will be moving posterior relative to the car. So if somebody is claiming that their knees hit the dashboard, it's physically impossible. It's biomechanically physically impossible. I've never seen it unless there was a rollover of the vehicle or the patient was ejected from the vehicle or they struck something from the front after the rear-end collision." The trial court did not abuse its discretion.

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education

13

sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) "A trial court's decision that a proposed witness qualifies as an expert under Evidence Code section 720 is a matter within the court's broad discretion and will not be disturbed on appeal unless the defendant demonstrates a manifest abuse of that discretion. [Citation.] When a preliminary showing is made that the proposed witness has sufficient knowledge to qualify as an expert under the Evidence Code, questions about the depth or scope of his or her knowledge or experience go to the weight, not the admissibility, of the witness's testimony." (*People v. Jones* (2013) 57 Cal.4th 899, 949-950; accord, *People v. Jackson* (2016) 1 Cal.5th 269, 327-328.)

Dr. Kvitne is a board-certified orthopedic surgeon who has practiced orthopedics in Los Angeles since 1987. He was previously a clinical professor of orthopedic surgery at the University of Southern California School of Medicine. More recently, he practiced at Cedars-Sinai Medical Center, where he trained residents and fellows. At trial, Dr. Kvitne acknowledged he had no education in biomechanics, but when asked on cross-examination whether he intended to testify about biomechanics, he responded he did not and instead intended to testify "from personal observations and my 30 years of practice."

Although Dr. Kvitne expressed his opinion that drivers in rear-end collisions could not "biomechanically" hit their knees against the dashboard, Dr. Kvitne did not base this opinion on application of engineering and physics principles to the movement of the human body, but rather, on his experience, saying he had "never seen it" except in limited circumstances not present here. And Maximo's attorney could have, but failed, to

14

clarify what Dr. Kvitne meant by the term "biomechanically." Dr. Kvitne's testimony was no different from that of Maximo's medical experts. Dr. Brooks, who similarly had no education or training in biomechanics, opined in response to a question about the biomechanics of the accident that Maximo would have hit her knee in the interior of the vehicle because of the movement of her body "backward[] and then . . . forward[] and then backward[] again." Dr. Brooks also opined that Maximo's injuries probably resulted from the contraction of her quadriceps muscle because she put her foot on the brake. Dr. Samimi similarly opined that Maximo was likely, because of how the car would "ricochet forward," to hit her knee against the dashboard or suffer an injury from pressing her knee (or foot) against the brake pedal. All three doctors based their opinions on whether Maximo suffered a serious knee injury from the accident on their experience with patients who had been in rear-end collisions. To the extent Dr. Kvitne's testimony strayed beyond the scope of his experience, this goes to the weight, not the admissibility, of his testimony. (*People v. Jones, supra*, 57 Cal.4th at pp. 949-950.)

Further, in explaining why he would not expect to see a serious knee injury from the accident, Dr. Kvitne appropriately relied on Maximo's condition after the accident. As Dr. Kvitne explained, Maximo was able to drive her vehicle from the accident scene, went to work the next day, drove herself to urgent care, and complained of only mild knee pain when she was seen at the urgent care facility. The urgent care facility did not take any X-rays, provide Maximo crutches, or prescribe pain medication. Dr. Kvitne stated these factors showed she "didn't have a significant knee injury." He also reviewed the MRI scan taken three weeks after her accident and opined that "[i]t showed

15

a chronic kneecap alignment issue that she's had on and off for years," and the lack of a bone bruise showed Maximo suffered at most a minor soft tissue injury from the accident.

Finally, to the extent Dr. Kvitne's opinion on how Maximo's body would have moved in the vehicle was beyond his expertise, Maximo has not demonstrated a miscarriage of justice because the testimony was cumulative of similar testimony from Balogh, who was Threatt's biomechanics expert. (See *Grail Semiconductor, supra,* 225 Cal.App.4th at p. 799.)

> b.    *Dr. Kvitne's testimony did not exceed the scope of his deposition testimony*

Maximo contends the trial court abused its discretion in overruling her attorney's objections to Dr. Kvitne's trial testimony on biomechanics and the reasonableness of Maximo's medical bills as exceeding the scope of the opinions he offered in his deposition. This contention lacks merit.

When an appropriate demand is made for the exchange of expert witness information, a party is required to disclose the general substance of the testimony the expert is expected to give at trial. (§ 2034.260, subd. (c)(2).) The disclosure allows the opposing party, in taking the expert's deposition, "to fully explore the relevant subject area . . . and to select an expert who can respond with a competing opinion on that subject area." (*Bonds v. Roy* (1999) 20 Cal.4th 140, 146-147; accord, *Cottini v. Enloe Medical Center* (2014) 226 Cal.App.4th 401, 416.) In an expert witness exchange, a party is required to """"disclose the substance of the facts and the opinions to which the expert will testify, either in his witness exchange list, or in his deposition, or both.""""" (*Dozier v. Shapiro* (2011) 199 Cal.App.4th 1509, 1518-1519;

accord, *Easterby v. Clark* (2009) 171 Cal.App.4th 772, 778 (*Easterby*); *Kennemur v. State of California* (1982) 133 Cal.App.3d 907, 919.) "'"When an expert is permitted to testify at trial on a wholly undisclosed subject area, opposing parties . . . lack a fair opportunity to prepare for cross-examination or rebuttal."'" (*Dozier*, at p. 1519; see *Easterby*, at p. 780.) "Although a party is required to '"disclose the *substance* of the facts and the opinions to which the expert will testify,"' this 'does not require disclosure of specific facts and opinions.'" (*DePalma v. Rodriquez* (2007) 151 Cal.App.4th 159, 165 (*DePalma*).) An expert opinion at trial exceeding the scope of deposition testimony may be excluded "if the opposing party has no notice or expectation that the expert will offer the new testimony, or if notice of the new testimony comes at a time when deposing the expert is unreasonably difficult." (*Easterby*, at p. 780; accord, *Dozier*, at pp. 1523-1524.)

In *DePalma, supra*, 151 Cal.App.4th at pages 162 to 163, the defendant's biomechanics expert testified at his deposition about an automobile accident, opining that based on the force of the impact on the plaintiff's vehicle, the plaintiff was not likely to have suffered any injury. At trial, the same expert testified more specifically that the accident would not have caused the plaintiff's knee and shoulder injuries. (*Ibid*.) The Court of Appeal concluded the trial court did not abuse its discretion in allowing the testimony at trial, explaining, "[T]he instant case is quite different from the situation . . . where testimony excluded by the trial court involved an entirely new area of testimony not previously disclosed. Here, [the expert's] trial testimony constituted merely an expanded description and interpretation of the conclusions stated in his deposition testimony." (*Id*., at

17

p. 165; cf. *Jones v. Moore* (2000) 80 Cal.App.4th 557, 566 [trial court did not abuse its discretion in excluding testimony of expert on whether lawyer breached a duty of care in family law proceeding concerning conduct after entry of judgment where expert testified at deposition only about prejudgment conduct and stated he would not offer other opinions at trial].)

When asked at his deposition to state the opinions he intended to provide at trial, Dr. Kvitne responded, "The biomechanics of a rear-end-collision motor vehicle accident would not produce, biomechanically, enough forces to injure the knee in any significant manner such that it would lead to surgery such as what happened in this case. So the biomechanics aren't sufficient to produce the forces necessary to create a patellofemoral malalignment or patellofemoral friction syndrome that would require surgery." Dr. Kvitne's statement that he intended to testify about the biomechanics of a rear-end collision and that the force would not be sufficient to produce Maximo's knee injury provided notice of the ""general substance"" of his testimony, and as in *DePalma*, his testimony at trial appropriately provided "an expanded description and interpretation of the conclusions stated in his deposition testimony." (*DePalma, supra*, 151 Cal.App.4th at pp. 165-166.)

Maximo argues the court should have barred Dr. Kvitne from testifying about biomechanics at trial because when asked at his deposition whether he intended "to testify about biomechanics in this case," Dr. Kvitne replied, "[N]o, just from personal observation in my 30 years of practice." But Dr. Kvitne's clarification was consistent with his testimony in which he based his opinion on how Maximo's body would have moved in the car on his personal experience with patients who had been in

18

rear-end collisions, not on calculations of the force of the collision or other mathematical equations.

Dr. Kvitne also stated in his deposition that he intended to testify at trial about the reasonableness of Maximo's medical expenses. He opined that Maximo would have benefitted from six to 12 weeks of physical therapy and the two cortisone injectioions Dr. Brooks performed. However, a reasonable expense for the physical therapy would have been $100 to $125 for each session and "under a hundred dollars" for the cortisone injections. Dr. Kvitne testified further that "*all* charges then that would have been incurred from the surgery, post-op rehab and any future medical care would not be necessary as a result of any injury that she would have sustained to her right knee on February 2nd, 2016." (Italics added.)

At trial, Dr. Kvitne similarly opined the charges for urgent care and evaluation by Dr. Brooks were reasonable, as well as three months of physical therapy, the knee brace, two cortisone injections, and an MRI and X-rays. Although Dr. Kvitne provided additional testimony at trial that the charges to review the MRI and X-rays were excessive, Dr. Kvitne made clear at his deposition that he intended to testify at trial on the reasonableness of Maximo's medical expenses, providing Maximo's attorney a full opportunity to question Dr. Kvitne about the reasonableness of each medical bill.[7] As to Dr. Kvitne's

_____

[7] In overruling Maximo's objection to Dr. Kvitne's testimony about the reasonableness of the bills for reviewing the MRI's and X-rays and the performance of the surgery, the trial court stated Dr. Kvitne could testify as to these subjects, but Maximo's attorney would have an opportunity to cross-examine him. However, Maximo's

19

testimony that the charges for Maximo's surgery and post-surgery rehabilitation were excessive, as in *DePalma, supra*, 151 Cal.App.4th at page 165, Dr. Kvitne's testimony at his deposition that Maximo should not have incurred "any" charges for surgery placed Maximo on notice that Dr. Kvitne would testify at trial that all specific surgery and post-surgery rehabilitation charges were unreasonable.

      c.      *The trial court cured any prejudice from Dr. Kvitne's testimony on medical reimbursements*

Maximo contends she was prejudiced by Dr. Kvitne's testimony referencing insurance company reimbursement rates. Although Maximo is correct that Dr. Kvitne's testimony was improper, there was no prejudice in light of the trial court's admonition to the jury to disregard the testimony.

Dr. Kvitne testified the charges for the two cortisone injections were excessive because they "would have been reimbursed at $100 . . . . So the bill is inflated and unreasonable." Maximo's attorney objected, arguing that Dr. Kvitne's testimony violated the trial court's ruling excluding any mention of reimbursement rates. The court sustained the objection at sidebar and ordered that Dr. Kvitne could only testify about what rates were reasonable in the doctor's opinion. However, when discussing the charges for physical therapy, Dr. Kvitne testified the charges were unreasonable because "physical therapy visits are reimbursed typically at $100 to $125." The court sustained

---

attorney did not inquire during his cross-examination of Dr. Kvitne about the reasonableness of these charges.

Maximo's objection and admonished the jury: "The court has indicated that as to the testimony pertaining to reimbursement, the motion is sustained. The jury is instructed to disregard the part of the testimony about reimbursement. That means you are to treat it as though you did not hear of it."

Maximo contends the trial court should have excluded all of Dr. Kvitne's testimony about the reasonableness of Maximo's medical bills given Dr. Kvitne's reliance on reimbursement rates. But the trial court properly admonished the jury to disregard the testimony about reimbursements. "We presume the jury followed the court's instruction." (*People v. Martinez* (2010) 47 Cal.4th 911, 957; accord, *People v. Flores* (2020) 9 Cal.5th 371, 405; *Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1250 ["[a]bsent some indication in the record, we presume the jury followed the court's instructions and that its verdict reflects the limitations the instructions imposed"].) Further, when Dr. Kvitne later reiterated his opinion about the medical bills without reference to reimbursement rates, Maximo's attorney had an opportunity to cross-examine Dr. Kvitne about the foundation for his opinion, but Maximo's attorney failed to do so. Under these circumstances, Maximo has not established that the improper testimony prejudiced her.

3.   *The trial court did not commit prejudicial error in overruling Maximo's objections to Balogh's testimony*

a.   *To the extent Balogh testified beyond the scope of her expertise in biomechanics, Maximo has not demonstrated prejudice*

Maximo contends the trial court abused its discretion in allowing Balogh to provide testimony on medical and injury

21

causation that was outside her area of expertise in biomechanics. To the extent Balogh's testimony exceeded the scope of her qualifications, it was not prejudicial.

Balogh is an expert in biomechanics, with a background in anatomy and kinesiology and a focus on "how the body moves" and "how external forces are applied to the human body and how the body reacts to it."[8] Her testimony about how Maximo's body would have moved within the car upon impact fell squarely within her experience as a biomechanical engineer. Balogh also properly relied on the fact Dr. Brooks did not note or recall seeing a contusion to Maximo's knee even though he evaluated her about a week after the accident. And Balogh used her training to opine that Maximo "would not have experienced an impact to the knee into the knee bolster based off of the fundamental principles of kinematics and Newtonian physics." Balogh's testimony that the accident did not cause Maximo's knee injury logically flowed from her opinion based on biomechanics in that she opined Maximo's knee did not hit the knee bolster or dashboard because her body was moving backward, not forward as a result of the impact.

---

[8] Maximo's motion in limine addressed Balogh's deposition testimony, in which Balogh stated she was not a licensed doctor, but she received medical training in graduate school while she was pursuing a degree in biomechanics. Balogh's resume (marked as an exhibit at her deposition) disclosed her professional background and experience in anatomy, physiology, and injury causation, including determining the cause of neck, back, and musclo-skeletal injuries. She also testified she had worked closely with orthopedists and other doctors on matters related to accidents in more than 200 personal injury cases.

Balogh's description of chondromalacia as an "overuse injury" and her opinion that Maximo's chondromalacia condition was "more likely . . . associated with some congenital disorders also diagnosed" veered into a medical opinion beyond her expertise.  But she was qualified to opine that the condition did not develop from an impact to Maximo's knee given Balogh's conclusion based on biomechanics that Maximo's knee did not hit the knee bolster or dashboard.  With respect to Balogh's testimony on whether Maximo's patella tilt and medial synovial plica were caused by the accident, this opinion involved medical testimony beyond Balogh's expertise, but it also rested on proper biomechanical analysis of the nature of the accident.  Balogh opined that Maximo "had maintained a position of her foot [on the brake] as she was pushed back into the cushion of the seat," which would have caused her knee to be extended a "little bit," but not fully, taking pressure off the patella.  Thus, Balogh opined, Maximo's "patella was not as compressed to the knee joint."

As the trial court observed in denying Maximo's motion in limine to exclude Balogh's testimony on causation, the question of what injuries an accident causes requires overlapping opinions on biomechanics and medicine.  The trial court granted leeway in these areas to both sides—allowing Maximo's medical experts to opine on the biomechanics of how Maximo's body would have moved within the car and Balogh to opine on whether the movement within the car would have caused Maximo's injuries.  To the extent the trial court abused its discretion in allowing Balogh to provide medical testimony as to the causes of the three conditions Maximo suffered, it was not reversible error because Balogh's testimony was cumulative to that of Dr. Kvitne.  And,

given Balogh's limited background beyond biomechanics, her testimony would have carried less weight on medical causation than that of Dr. Kvitne and Drs. Brooks and Samimi. Thus, Maximo has not met her burden to show it is reasonably probable she would have obtained a more favorable result had the trial court excluded Balogh's testimony on Maximo's medical conditions. (*Grail Semiconductor, supra*, 225 Cal.App.4th at p. 799.)

### b. *Balogh's testimony did not exceed the scope of her deposition testimony*

Maximo contends the trial court erred in overruling Maximo's objection to Balogh's trial testimony because the testimony exceeded the scope of the declaration of Threatt's attorney under section 2034.260, subdivision (c)(2), and Balogh's deposition testimony. The trial court did not err.

During discovery, Threatt's attorney disclosed in her declaration under section 2034.260, subdivision (c)(2), that Balogh was a biomechanical engineer specializing in "human factors analysis and issues, accident investigations, [and] illumination measurement dealing with areas including automobile accidents." Further, Balogh "is expected to testify about human factors issues as they pertain to the automobile accident which is [the] subject of the plaintiff's complaint. She may also testify regarding the speeds, velocities, and delta-V of the involved subject automobile and pedestrian. She is also expected to testify regarding the lighting conditions, visibility, human perception, cognition, motor skills reaction time; foreseeability of human behavior and/or behavioral expectations of the parties to this litigation."

24

Although the declaration from Threatt's attorney did not state that Balogh would testify on whether the movement of Maximo in the vehicle caused her injuries, Balogh testified on this subject during her deposition, and Maximo's attorney thoroughly cross-examined her on those opinions. Further, Drs. Brooks and Samimi provided opinions that contradicted Balogh's, opining that the biomechanics of the accident would have caused Maximo's knee injury by pushing her knee against the dashboard or her foot onto the brake pedal. Thus, Threatt's failure to comply strictly with the expert disclosure requirements did not result in unfair surprise or prejudice. (See *Easterby, supra,* 171 Cal.App.4th at p. 780 ["[D]efendants in this case had the opportunity to take Regan's deposition in light of his changed opinion and prepare for cross-examination and rebuttal of his testimony. The elements of unfair surprise and prejudice . . . are entirely absent in this case."].)

Balogh stated at her deposition that she intended to provide her opinion at trial that Maximo's "claimed knee injury . . . was not [a result] of this car accident." When asked whether she had any other opinions, Balogh responded, "Everything that leads up to that would be involved in those opinions." Balogh added that based on "occupant kinematics, it was very unlikely that [Maximo] sustained a knee injury . . . that was diagnosed within the relative MRI as a result of this incident." At trial, Balogh provided greater detail as to the cause of each of Maximo's injuries, opining that they did not result from the accident. At her deposition, Balogh also addressed Maximo's underlying medical conditions, acknowledging that trauma can cause injury to the medial femoral plica and increased friction to the medial femoral condyle, but opining that the conditions was

25

"often considered to be congenital." Balogh opined further that she did not believe the patella tendon friction syndrome Maximo experienced resulted from the accident. At trial, Balogh repeated these opinions and provided a detailed description of the anatomy of the knee using a diagram of the knee and explaining her opinion why Maximo did not suffer a serious knee injury from the accident.

Although Balogh provided greater detail at trial than in her deposition, Maximo was on notice from Balogh's deposition testimony that Balogh intended to opine at trial that Maximo's knee did not hit the knee bolster or dashboard during the accident, and thus, did not cause Maximo's knee injuries. (See *Easterby, supra*, 171 Cal.App.4th at p. 780.)

c. *The trial court did not abuse its discretion in denying Maximo's motion to exclude Balogh's expert opinions based on an improper "experiment"*

Maximo contends the trial court abused its discretion in denying her motion in limine to exclude Balogh's expert opinions because they were based on an experiment that did not use scientific methodology. Maximo had argued in her motion in limine that Balogh's expert opinions were improperly based on photographs attached to her expert report that showed "a person of unidentified height, weight, name, age, experience, or even identity in the seat of a Kia of a different year than Plaintiff's vehicle," without any information about the positioning of Maximo's seat, seat belt, or steering wheel, or the type of shoes Maximo was wearing. The photographs showed the position of a woman's leg, knee, and foot in relation to the steering column and

26

brake pedal. Maximo argues the photographs did not meet the *Kelly-Frye*[9] standard of admissibility for scientific evidence, and thus, the court should have excluded them. Maximo's contention lacks merit.

"Given the broad discretion accorded to trial courts to determine the relevancy of evidence, trial judges bear a substantial gatekeeping responsibility to ensure the proper use of expert testimony." (*People v. Tran* (2020) 50 Cal.App.5th 171, 185; see *Sargon, supra*, 55 Cal.4th at pp. 771-772 ["the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative"]; Evid. Code, § 801, subd. (b) [an expert's testimony must be "[b]ased on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates. . . ."].) However, as the Supreme Court observed in *Sargon*, "[C]ourts must also be cautious in

---

[9] The *Kelly-Frye* test is derived from *People v. Kelly* (1976) 17 Cal.3d 24, 30 and *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013, 1014. Under the test, "'the proponent of evidence derived from a new scientific technique must establish that: (1) the reliability of the new technique has gained general acceptance in the relevant scientific community, (2) the expert testifying to that effect is qualified to give an opinion on the subject, and (3) the correct scientific procedures were used.'" (*People v. Jones, supra*, 57 Cal.4th at p. 936.)

27

excluding expert testimony.  The trial court's gatekeeping role does not involve choosing between competing expert opinions. . . .  [T]he gatekeeper's focus 'must be solely on principles and methodology, not on the conclusions that they generate.'"  (*Sargon*, at p. 772.)

Contrary to Maximo's contention, Balogh did not base her opinion solely on photographs of a woman driving a car similar to Maximo's.  Balogh testified that her expert opinions were based on (1) Balogh's background and expertise in biomechanics; (2) Balogh's review of Maximo's medical records and Maximo's subjective complaints about her injuries; (3) the report of the accident reconstruction expert, Wang, and his calculation of the Delta V change in velocity of Maximo's car upon impact (from nine to 10 miles per hour); (4) Wang's opinion the accident had a "slight underride"; (5) Wang's calculation of the "vertical displacement of the Kia at the dashboard" of approximately one inch; and (6) an "exemplar model," which was "a human model of the same height and an exemplar vehicle," which was a 2015 Kia Optima (the same year and model of Maximo's vehicle).

Maximo is correct that Balogh acknowledged in cross-examination that she did not know how Maximo's seat was adjusted, how long Maximo's legs were, or what type of shoes she was wearing.  But Maximo's attorney did not elicit any evidence that these factors would have affected Balogh's opinion.  Nor did Maximo show through cross-examination or her own expert's testimony that Balogh's opinions were subject to analysis under the *Kelly-Frye* test because they fell within the "limited class of expert testimony which is based, in whole or part, on a technique, process, or theory which is *new* to science and, even more so, the law.'"  (*People v. Leahy* (1994) 8 Cal.4th 587, 605; accord, *People*

*v. Tran, supra,* 50 Cal.App.5th at pp. 186-187.) Although Maximo focuses on the unscientific nature of an expert relying on photographs, the photographs were properly shown to the jury as a demonstrative exhibit to explain Balogh's testimony, not as the basis of her testimony. (See *Tran*, at pp. 187-188 [*Kelly-Frye* test does not apply to demonstrative evidence offered to assist the jury to understand expert testimony].) It was up to the jury to determine the credibility of Balogh and the weight to give her testimony. (*Johnson & Johnson Talcum Powder Cases* (2019) 37 Cal.App.5th 292, 330.)

B.      *The Trial Court Did Not Abuse Its Discretion in Denying Maximo's Motions in Limine To Exclude Evidence of Her Doctors' Medical Liens*

Maximo contends the trial court abused its discretion in denying her motion in limine to preclude Threatt from asking Maximo's doctors whether they placed liens on Maximo's recovery to obtain payment for the medical treatment they provided because the evidence was irrelevant and unduly prejudicial. The court did not abuse its discretion.

In determining the credibility of a witness, the jury may consider "any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing," including "[t]he existence or nonexistence of a bias, interest, or other motive." (Evid. Code, § 780, subd. (f); see *Calvert v. State Bar* (1991) 54 Cal.3d 765, 777 ["Generally, any fact or circumstance tending to show that a witness has a financial interest in the outcome of a legal proceeding is a proper ground for impeachment."].) Evidence that Maximo's doctors placed liens on her recovery was relevant to the doctors' credibility because it

tended to show they had a financial interest in the outcome of the case.

Further, the trial court did not abuse its discretion in declining to exclude the evidence under Evidence Code section 352. "'[T]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. . . . The stronger the evidence, the more it is 'prejudicial.' The 'prejudice' referred to in Evidence Code section 352 applies to evidence that uniquely tends to evoke an emotional bias against the defendant as an individual and has minimal effect on the issues. In applying section 352, 'prejudicial' is not synonymous with "'damaging.'"'" (*People v. Jones* (2017) 3 Cal.5th 583, 610; accord, *People v. Bell* (2019) 7 Cal.5th 70, 105 ["Evidence is not prejudicial, as that term is used in an [Evidence Code] section 352 context, merely because it undermines the opponent's position or shores up that of the proponent."].) Here, the lien evidence was damaging precisely because it was relevant to the doctors' credibility, not because it was designed to evoke an emotional reaction in the jury.

C.   *The Trial Court Did Not Err in Denying Maximo's Motion in Limine To Exclude Evidence That Her Attorney Referred Her to Specific Doctors*

Maximo contends the trial court erred in denying her motion in limine to exclude evidence that her attorney referred her to Dr. Brooks and Dr. Samimi, arguing her attorney's referral

30

was protected under the attorney-client privilege. The trial court did not err.[10]

The attorney-client "privilege does not apply to every single communication transmitted confidentially between lawyer and client. Rather, the heartland of the privilege protects those communications that bear some relationship to the attorney's provision of legal consultation." (*Los Angeles County Bd. of Supervisors v. Superior Court* (2016) 2 Cal.5th 282, 294; accord, *Wood v. Superior Court* (2020) 46 Cal.App.5th 562, 576.) Thus, the attorney-client privilege does not apply where a person consults an attorney for advice in a nonlegal capacity, for example, when an attorney is acting "'merely as a negotiator for the client or is providing business advice.'" (*Los Angeles County Bd. of Supervisors*, at p. 296; see *Watt Industries, Inc. v. Superior Court* (1981) 115 Cal.App.3d 802, 805 [attorney-client privilege did not attach "where . . . the attorney act[ed] merely as a business agent for the client in conveying the client's position to a contracting party"].) Maximo's attorney's provision of a list of

---

[10] We review the trial court's finding on undisputed facts that a communication falls within the attorney-client privilege de novo. (See *HLC Properties, Ltd. v. Superior Court* (2005) 35 Cal.4th 54, 60; see also *Sprengel v. Zbylut* (2019) 40 Cal.App.5th 1028, 1042 [where the facts are undisputed, "[t]he existence of an attorney-client relationship involves a question of law that we review de novo"].) "The party claiming a privilege shoulders the burden of showing that the evidence it seeks to suppress falls within the terms of an applicable statute." (*HLC Properties*, at p. 59.)

31

doctors to Maximo, like an attorney providing business advice, in no way was the rendering of confidential legal services falling within the attorney-client privilege.

D. *The Trial Court Did Not Err in Refusing To Instruct the Jury on the "Eggshell Plaintiff" Theory*

Maximo's attorney requested the trial court instruct the jury on the "eggshell plaintiff" theory with CACI No. 3928 (unusually susceptible plaintiff).[11] He argued that Drs. Brooks and Samimi opined that Maximo's preexisting condition of patella tilt made her more susceptible to injury from the car accident and that Balogh testified that patella tilt would make her more susceptible to friction syndrome. But he agreed there was no evidence that the 2013 accident made Maximo more prone to injury. The court disagreed with Maximo's characterization of the experts' testimony and sustained Threatt's objection, finding "there's no testimony that she is an unusually susceptible plaintiff." On appeal, Maximo contends the trial court erred in denying her request for the jury instruction because the experts testified that Maximo had congenital conditions that made her more susceptible to injury. The court did not err.

"A party is entitled upon request to correct, nonargumentative [jury] instructions on every theory of the case

---

[11] CACI No. 3928 provides the jury "must decide the full amount of money that will reasonably and fairly compensate [plaintiff] for all damages caused by the wrongful conduct of [defendant], even if [plaintiff] was more susceptible to injury than a normally healthy person would have been, and even if a normally healthy person would not have suffered similar injury."

32

advanced by [the party] which is supported by substantial evidence." (*Soule v. General Motors Corp*. (1994) 8 Cal.4th 548, 572; accord, *Olive v. General Nutrition Centers, Inc*. (2018) 30 Cal.App.5th 804, 813; see *Ng v. Hudson* (1977) 75 Cal.App.3d 250, 259, disapproved on another ground in *Soule*, at pp. 574-576 [trial court erred in refusing instruction on aggravation of preexisting condition where there was substantial evidence that car accident aggravated plaintiff's condition].) We review the record de novo to determine whether substantial evidence supported giving a refused jury instruction. (*Evans v. Hood Corp*. (2016) 5 Cal.App.5th 1022, 1045; *Davis v. Honeywell Internat. Inc*. (2016) 245 Cal.App.4th 477, 495.) In making this determination, we review the evidence in the light most favorable to the appellant. (*Regalado v. Callaghan* (2016) 3 Cal.App.5th 582, 594; *Ayala v. Arroyo Vista Family Health Center* (2008) 160 Cal.App.4th 1350, 1358.)

There was no substantial evidence that Maximo was more susceptible to injury from her preexisting knee conditions. As Maximo's attorney conceded at the instruction conference, Maximo testified she fully recovered from the 2013 car accident in which she injured her right knee. She also denied she had any chronic knee problems. Dr. Brooks testified that Maximo's patella tilt could cause friction or rubbing and chondromalacia. But he opined the accident was the sole cause of Maximo's knee injury, requiring surgery. Dr. Samimi opined that Maximo had patella tilt since birth, and the chondromalacia could have been present for up to two years, which caused Maximo pain. But he opined it was the 2016 car accident that caused Maximo's knee injury requiring surgery. Although the surgery corrected the patella tilt and chondromalacia, neither Dr. Brooks nor

33

Dr. Samimi opined that these conditions played a role in causing Maximo to suffer a knee injury from the car accident. And contrary to Threatt's contention, Balogh opined that the trauma from the car accident would not have caused the chondromalacia, which was associated with Maximo's congenital patella tilt and medial synovial plica. Balogh never testified the trauma from the accident exacerbated Maximo's preexisting knee conditions. To the contrary, Balogh opined Maximo's knee never pressed into the steering wheel, the knee bolster, or the dashboard.

E.    *The Trial Court Did Not Err in Awarding Threatt an Offset for His Costs Under Section 998*

Maximo contends the trial court committed reversible error in entering a judgment for Threatt without Threatt first filing a postjudgment motion seeking an offset under section 998. Maximo also argues the expert witness costs Threatt sought in his memorandum of costs "may be" double-billed or miscalculated, given that Threatt's experts presented updated opinions at trial, and it is "more than likely" Maximo's attorney incurred more than $12,000 in pre-offer costs to which she was entitled. Neither contention has merit.

Maximo provides no authority for her contention that Threatt could only recover his costs as an offset if he first filed a motion seeking an offset. It was Maximo who could, but did not, file a motion to strike or tax costs to challenge the costs sought by Threatt. (See, e.g., *Khosravan v. Chevron Corp.* (2021) 66 Cal.App.5th 288, 290-291 [reversing award of expert witness fees as costs to defendants under section 998 on appeal from post-judgment order denying plaintiffs' motion to strike or tax costs]; *Adams v. Ford Motor Co.* (2011) 199 Cal.App.4th 1475, 1478

34

[trial court did not abuse its discretion in denying plaintiffs' motion to tax costs claimed by defendant under section 998 in memorandum of costs].)

As the Court of Appeal explained in *Jonkey v. Carignan Construction* Co. (2006) 139 Cal.App.4th 20, 27, "[T]he trial court [did not] err in awarding expert witness costs claimed in a cost bill rather than a noticed motion. Code of Civil Procedure section 998 grants the trial court discretion to award expert witness fees to a qualifying prevailing party. The fees may be claimed in a cost bill; there is no rule requiring a noticed motion." (See § 998, subd. (e) ["If an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment or award, the costs under this section, from the time of the offer, shall be deducted from any damages awarded in favor of the plaintiff. If the costs awarded under this section exceed the amount of the damages awarded to the plaintiff the net amount shall be awarded to the defendant and judgment or award shall be entered accordingly."].)

To the extent Maximo is challenging the reasonableness of the costs awarded, she has forfeited any objection by not filing a motion to tax or strike costs. (See *Douglas v. Willis* (1994) 27 Cal.App.4th 287, 289-290 ["[t]he 'failure to file a motion to tax costs constitutes a waiver of the right to object'" to a costs bill]; *Jimenez v. City of Oxnard* (1982) 134 Cal.App.3d 856, 859 ["[b]y not filing said motion within the period specified in section 1033, plaintiffs waived the right to object to the costs claimed by the city"]; see Cal. Rules of Court, rule 3.1700(b)(1) ["Any notice of motion to strike or to tax costs must be served and filed 15 days after service of the cost memorandum."] & (b)(4) ["After the time has passed for a motion to strike or tax costs or for determination

of that motion, the clerk must immediately enter the costs on the judgment."].)

## DISPOSITION

The judgment is affirmed.  Threatt is to recover his costs on appeal.


FEUER, J.

We concur:


PERLUSS, P. J.


WISE, J.*

---

\* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.